**George MOSKOWITZ, on behalf of himself and all others similarly situated**

v.

**W. James LOPP, II; E.F. Hutton Group, Inc.; Robert P. Rittereiser; Robert Fomon; and Scott Pierce.**

**Civ. A. No. 88–0355.**

United States District Court, E.D. Pennsylvania.

Dec. 7, 1989.

**626**

Richard D. Greenfield, Greenfield & Chimicles, Haverford, Pa., for Moskowitz.

William G. Scarborough, Stradley, Ronon, Stevens & Young, Philadelphia, Pa., P.M. Solomon, Louis A. Craco, Willkie Farr & Gallagher, New York City, for E.F. Hutton Group, Inc.

Jerome J. Shestack, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for Robert P. Rittereiser.

Stewart Dalzell, Drinker Biddle & Reath, Philadelphia, Pa., for Robert Fomon.

Juan M. Acosta, Kutak Rock & Campbell, Washington, D.C., Louis N. Marks, Ira B. Silverstein, Marks & Associates, Philadelphia, Pa., for W. James Lopp, II and Scott Pierce.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

Presently before the court are plaintiff's motions for class certification pursuant to Fed.R.Civ.P. 23(a) and (b)(3) and to compel the production of documents which defendants claim are protected by the attorney-client privilege. For the reasons set forth herein, plaintiff's motion for class certification will be granted as to counts I and III,

and denied as to count II. In addition, plaintiff's motion to compel will be denied as to defendant E.F. Hutton Group, Inc., and granted as to defendants Lopp, Rittereiser, Fomon and Pierce insofar as these defendants assert the defense of reliance upon the advice of counsel. All individual assertions of the privilege shall be referred to the Special Master for a document-by-document determination as to the application and relevance of the privilege.

## I. BACKGROUND

This is a securities fraud action arising out of the events preceding and surrounding the purchase of E.F. Hutton Group, Inc. by Shearson/Lehman Brothers, Inc., in December of 1987. During the alleged class period, defendant Hutton was a Delaware corporation engaged in securities brokerage, investment banking, and public and corporate finance. Its common stock was publicly traded on the New York, London and Pacific Stock Exchanges, and options on the stock were traded on the American Stock Exchange.

Defendants W. James Lopp II, Robert P. Rittereiser, Robert Fomon and Scott Pierce were officers and directors of Hutton during the relevant period. Specifically, defendant Fomon was Chairman and Chief Executive Officer until December 1986 when he was relieved of his duties as Chief Executive and replaced by defendant Rittereiser. Fomon was likewise relieved of his duties as Chairman in May of 1987 but was retained by Hutton as a consultant.

Plaintiff George Moskowitz was a purchaser of E.F. Hutton securities. Count I of plaintiff's amended complaint claims that the management of Hutton engaged in a scheme to defraud purchasers of Hutton securities by failing to disclose the severity of the company's declining financial condition during the period following its plea of guilty to some 2,000 counts of mail and

wire fraud in 1985. The resultant liquidity crisis led to the downgrading of Hutton's commercial paper rating, the cessation of bank loans to Hutton, and its eventual sale to Shearson/Lehman Brothers at a price substantially below market.[1] The fraud was allegedly manifested through various omissions and misrepresentations contained in Hutton's 1986 and 1987 Quarterly and Annual Reports filed pursuant to Securities and Exchange Commission ("SEC") regulations. Plaintiff alleges that these misrepresentations and omissions caused the class to purchase Hutton securities at artificially inflated prices in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5.[2] He seeks certification as representative of a class of:

all persons who purchased equity securities of E.F. Hutton Group, Inc. ("Hutton") or purchased "call" options for Hutton common stock or sold "put" options for Hutton common stock during the period July 1, 1986 through November 23, 1987, inclusive (the "Class Period"), and who sustained damages as a result of such transactions. Excluded from the Class are the defendants herein, members of the Board of Directors of Hutton, any subsidiary, affiliate or controlled person of any such person or entity, members of the immediate families of all such persons, any trusts or entities which they control, and their respective heirs, legal representatives, successors and assigns.

Count II restates the allegations of Count I as common law fraud and deceit.

Count III asserts a cause of action for insider trading under Rule 10b–5, along with various common law theories of fraud and unjust enrichment, against defendant Fomon only. Plaintiff claims that Fomon traded in Hutton securities, including call and put options, based on material nonpub-

---

**1.** Defendants have attacked plaintiff's amended complaint in a motion for judgment on the pleadings under Fed.R.Civ.P. 12(c). Defendants argue that plaintiff's allegations of corporate mismanagement are more properly the subject of a shareholders derivative suit and do not state a cause of action under the securities laws. *See Santa Fe Ind., Inc. v. Green,* 430 U.S. 462, 97

S.Ct. 1292, 51 L.Ed.2d 480 (1977). That motion will be addressed by the court in a separate Memorandum and Order.

**2.** Plaintiff claims liability under Rule 10b–5 against individual defendants Lopp, Rittereiser, Fomon and Pierce as control persons under § 20 of the Exchange Act, 15 U.S.C. 78t.

lic information that the market price of Hutton stock would decrease substantially as a result of pending merger negotiations. Defendant Fomon is alleged to have misappropriated this information as an officer and director, and later as a consultant hired by Hutton to find a suitable merger partner.

## A. Class Certification

Class action treatment of related claims is particularly appropriate and desirable when plaintiffs seek redress for violations of the securities laws. It is well recognized that private enforcement of these laws is a necessary supplement to government regulation. *See Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.) *cert. denied sub nom. Wasserstrom v. Eisenberg,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985); *Gavron v. Blinder Robinson & Co., Inc.,* 115 F.R.D. 318, 321 (E.D.Pa.1987). Accordingly, in an alleged securities fraud case, when a court is in doubt as to whether or not to certify a class action, the court should err in favor of allowing the class to go forward. *Eisenberg, supra,* 766 F.2d at 785. However, courts may approve class actions only after a "rigorous analysis" ensuring compliance with Fed.R.Civ.P. 23. *General Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982).

When seeking class certification, plaintiff bears the burden of proving that the action satisfies all four threshold requirements set forth in Fed.R.Civ.P. 23(a), and falls within one of the categories of Rule 23(b). *Eisen v. Carlisle & Jacqueline,* 417 U.S. 156, 163, 94 S.Ct. 2140, 2145, 40 L.Ed.2d 732 (1974). Rule 23(a) provides:

(a) *Prerequisites to a Class Action.* One or more members of a class may sue, or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

A plaintiff relying on Rule 23(b)(3) must meet two additional criteria: (1) questions of law or fact common to class members must predominate over any questions affecting individual members; and (2) the class action device must be superior to any other method of adjudication. Fed.R.Civ.P. 23(b)(3).

### 1. *Numerosity*

Rule 23(a)(1) permits class action treatment only when "the class is so numerous that joinder of all class members is impracticable." No magic number exists satisfying the numerosity requirement, nor must plaintiff allege the exact number or identity of class members. *Dirks v. Clayton Brokerage Co. of St. Louis, Inc.,* 105 F.R.D. 125, 131 (D.Minn.1985), *citing,* 7B Wright & Miller, *Federal Practice & Procedure* § 1762, at 562; *Zeffiro v. Pennsylvania Bank & Trust Co.,* 96 F.R.D. 567, 569 (E.D.Pa.1983). It is proper for the court "to accept common sense assumptions in order to support a finding of numerosity." *Wolgin v. Magic Marker Corp.,* 82 F.R.D. 168, 171 (E.D.Pa.1979).

■ The numerosity requirement is clearly satisfied in this case. Plaintiff's complaint avers that during the class period there were at least 6,284 registered shareholders of E.F. Hutton Group, Inc., at least 29,000 beneficial owners of Hutton common stock, and a substantial number of Hutton options traders the identities of whom can be ascertained from trading records. Immediately prior to the tender offer by Shearson, there were 32.9 million shares of Hutton stock outstanding. *See* First Amended Complaint, ¶ 12. Accordingly, the class is so numerous that joinder is impracticable.

### 2. *Commonality*

The commonality requirement of Rule 23(a)(2) has been applied permissively by courts in the context of securities fraud litigation. *Snider v. Upjohn Co.,* 115 F.R.D. 536, 539 (E.D.Pa.1987); *Peil v. National SemiConductor Corp.,* 86 F.R.D. 357, 367 (E.D.Pa.), *cert. denied,* 474 U.S. 903, 106 S.Ct. 232, 88 L.Ed.2d 230 (1985). Commonality is not defeated by slight differences in class members' positions or be-

cause "all of the allegations of the class do not fit together like pieces in a jigsaw puzzle." *Green v. Wolf Corp.*, 406 F.2d 291, 300 (2d Cir.1968), *cert. denied*, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969). In ascertaining whether plaintiff satisfies Rule 23(a)(2), the court must refrain from considering the merits of the substantive claims. *Eisen, supra,* 417 U.S. at 177–78, 94 S.Ct. at 2152–53. The court is limited to verifying the existence of common questions of law or fact.

■ Plaintiff's allegations that E.F. Hutton Group and its management omitted material information from its public disclosures thereby inflating the price of Hutton stock is the paradigmatic common question of law or fact in a securities fraud class action. *See Cohen v. UniRoyal, Inc.,* 77 F.R.D. 685, 690 (E.D.Pa.1977). Section 10(b) of the Securities Exchange Act makes it unlawful for any person:

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. In response, the SEC promulgated Rule 10b–5 which makes it unlawful for any person:

(a) to employ any device, scheme, or artifice to defraud,

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading, or

(c) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

In order to establish a prima facie case under Rule 10b–5, a plaintiff must plead and prove (1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which plaintiff reasonably relied, and (5) which was the proximate cause of the losses sustained. *See Peil v. Speiser,* 806 F.2d 1154, 1160 (3d Cir.1986); L. Loss, *Fundamentals of Securities Regulation,* at 955–59 (1988). Common questions in this litigation center upon whether defendants' conduct violated the aforesaid elements of Rule 10b–5 and include, but are not necessarily limited to, whether Hutton's Annual and Quarterly Reports contained misrepresentations or omitted material facts and whether this was done with the requisite degree of knowledge on the part of defendants. As to Count III, common questions include Fomon's knowledge during his options trading in the class period. The commonality requirement is therefore satisfied.

### 3. *Typicality*

■ The claims of the representative parties must be typical of the claims of the class. Fed.R.Civ.P. 23(a)(3). The typicality requirement is a safeguard against interclass conflicts, insuring that the named plaintiff's interests are more or less coextensive with those of the class. *Sley v. Jamaica Water & Utilities, Inc.,* 77 F.R.D. 391, 394 (E.D.Pa.1977). In this respect, the typicality requirement overlaps with the Rule 23(a)(4) requirement since it ensures that absent class members will be adequately represented.

The typicality requirement is met if the plaintiff's claim arises from the same event or course of conduct that gives rise to the claims of other class members and is based on the same legal theory. *Zeffiro, supra,* 96 F.R.D. 567. As this court has stated:

The heart of this requirement is that plaintiff and each member of the represented group have an interest in prevailing on similar legal claims. Assuming such an interest, particular factual differences, differences in the amount of damages claimed, or even the availability of certain defenses against a class representative may not render his or her claims atypical.

*Id.* at 569–70. *See also Snider, supra,* 115 F.R.D. at 540. H. Newberg, *Newberg on Class Actions* § 1115(b) (1985).

Furthermore, the United States Court of Appeals for the Third Circuit has observed that typical does not mean "identical". Thus, the focus of the typicality requirement entails an inquiry into whether the plaintiff's individual circumstances are markedly different or whether the legal theory upon which the claims are based differs from that upon which the claims of the other class members will be based. *Eisenberg, supra,* 766 F.2d at 786.

Defendants attack typicality on counts I and II stating that an analysis of plaintiff's trading records in Hutton securities during the class period reflect that he did not rely on market price as an indication of the value of Hutton securities but, instead, sought to profit from short-term movements in price arising from takeover speculation, a process commonly known as takeover arbitrage. *See* F. Avneyon, *Dictionary of Finance* (1988), at 447. Defendants claim that this prevents plaintiff from establishing reliance, an essential element of his 10b–5 claim, thereby rendering him atypical. Defendants, however, misconstrue the burden of proof under the theory of plaintiff's case.

■ Plaintiff has brought this cause of action under the fraud-on-the-market theory. Fraud-on-the-market obviates the need to prove subjective reliance in open market transactions since the market is interposed between the buyer and seller. It is based on the efficient capital market hypothesis which states that material information concerning a firm is immediately reflected in the stock price. As adopted by the United States Supreme Court in *Basic, Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), it creates the presumption that:

> An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b–5 action.

*Id.* 108 S.Ct. at 991–92. *See also Peil v. Speiser,* 806 F.2d 1154, 1161 (3d Cir.1986).

The Third Circuit has found that this presumption is threefold. First, the court presumes that the misrepresentation affected the market price. Second, it presumes that a purchaser did in fact rely on the price of the stock as an indication of its value. Third, it presumes the reasonableness of the reliance. *Zlotnick v. Tie Communications,* 836 F.2d 818, 822 (3d Cir. 1988). A defendant may rebut this presumption by showing that the price was unaffected by the fraud or that plaintiff would have made the purchase regardless of the undisclosed information. *Id. See also Blackie v. Barrack,* 524 F.2d 891, 906–07 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976).

The focus in a fraud-on-the-market case thus shifts from actual reliance to the concept of "transaction causation" which, as described by the Third Circuit in *Peil v. Speiser,* arises from two important facts: 1) that the linchpin of the reliance requirement is a causal connection between defendants' actions and plaintiff's purchase of stock; and 2) that in certain cases, it is sensible to shift the burden of disproving reliance to the defendants. 806 F.2d at 1161 n. 11. *See also* Note, *The Fraud on the Market Theory and the Efficient Markets Hypothesis: Applying a Consistent Standard* 14 J.Corp.L. 443 (1988). Whether called reliance or "transaction causation", fraud-on-the-market still requires a plaintiff to prove a causal nexus between defendants' conduct and the injury sustained. The theory merely bridges this gap by presuming reliance upon a showing that the omission or misrepresentation was material,[3] but only where it is "logical to do so". *Id., quoting, Sharp v. Coopers & Lybrand,* 649 F.2d 175, 188 (3d Cir.1981), *cert. denied,* 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982).

■ Defendants argue that it is illogical to presume reliance upon the integrity of the market *price* of a security when an

---

**3.** An omitted fact is material if there is a "substantial likelihood that a reasonable shareholder would consider it important . . ." *TSC Industries,*

*Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

investor is actually betting against that price. *See Basic, Inc. v. Levinson*, 108 S.Ct. at 996 (White, J., concurring in part and dissenting in part). In support of their contention that plaintiff did not rely on the market price in his decision to purchase Hutton securities, defendants offer a detailed analysis of plaintiff's Prudential-Bache trading account. *See* Exhibits B and C in Opposition to Plaintiff's Motion for Class Certification. Defendants allege that this analysis reveals a strategy of employing options, together with simultaneous buy-sell orders, to make profits by focusing not on whatever underlying value may have been reflected in Hutton's stock price, but on short-term price movements caused by possible merger and acquisition activity. *See* Affidavit of Norman E. Kjono in Opposition to Plaintiff's Motion for Class Certification. From this, defendants argue that the causal chain has been severed and that plaintiff is an atypical class representative since he relied on factors extraneous to those of the class. Defendants further argue that it is "plainly illogical to presume the necessary reliance where the proposed class encompasses investors of every stripe, many of whom purchased Hutton stock without regard to, and, in some cases, in spite of price. For example, the class perforce includes 'program' traders, institutions, short sellers covering their positions, arbitrageurs and takeover speculators, such as Moskowitz." Memorandum of Defendants W. James Lopp, II and Scott Pierce in Opposition to Plaintiff's Motion for Class Certification, at 13.[4]

However, simply because an investor is engaging in takeover speculation does not necessarily mean that the fraud-on-the-market presumption does not obtain. First, the possible availability of a unique defense does not foreclose class certification, *Fickinger v. C.I. Planning Corp.*, 103 F.R.D. 529, 532 (E.D.Pa.1984), otherwise the fraud-on-the-market presumption would transmogrify every securities fraud class certification motion into a full-blown attack on the merits. Exactly what plaintiff relied on in purchasing and selling his shares of Hutton stock is a question of fact which can not be resolved at the class action stage. *Eisen v. Carlisle & Jacqueline*, 417 U.S. at 177–78, 94 S.Ct. at 2152–53. Second, "[t]raders in puts and calls rely on the integrity of information disseminated in the market just as do purchasers and sellers of the underlying security." *Tolan v. Computervision Corp.*, 696 F.Supp. 771, 779 (D.Mass.1988). There is a fundamental difference between an investor's presumption that the market price will move and the fact that the price was tainted by fraud.

Moreover, under defendants view of the case, any plaintiff seeking to represent a class of investors of a large, publicly traded corporation would be unable to satisfy reliance, and, hence, typicality, as a matter of law. This would lead to an anomalous result. The fraud-on-the-market presumption is applied to establish reliance, not in face-to-face transactions involving closely-held corporations, but in the impersonal securities exchanges where proof of direct reliance is virtually impossible. *Basic, supra*, 108 S.Ct. at 989–90, n. 22. It can be stated without fear of gainsay that the shareholders of every large, publicly traded corporation includes institutional investors, short-sellers, arbitragers etc. The fact that these traders have divergent motivations in purchasing shares should not defeat the fraud-on-the-market presumption absent convincing proof that price played *no* part whatsoever in their decision making. If defendants believe that this stretches the concept of reliance beyond the intent of the statute, their course of attack is to overrule *Basic*, not render its holding meaningless. That is not to say that there are no set of facts which may properly rebut the fraud-on-the-market presumption on a motion under Rule 23; however, on the present record the court finds that the evidence is sufficient to support plaintiff's claim that he is a typical class representative under count I.

---

4. Defendants also argue that these potential differences in reliance among proposed class members show that common questions of law or fact do not predominate over questions affecting individual members as required by Rule 23(b)(3). The court will address these arguments in the context of typicality.

■ Finally, defendants argue that the stock market "crash" of October 1987 should be considered an intervening cause of plaintiff's loss as a matter of law. The impact of the devaluation of the stock market on October 19, 1987 on the loss causation aspect of plaintiff's claim is also a question to be decided on the merits and not at the class certification stage.

■ Since plaintiff depends on the fraud-on-the-market theory to establish reliance in this case, there are unique reasons why his pendent state law claims under count II should not be certified for class action treatment. The fraud-on-the-market theory of reliance has not been developed in state courts, *Snider v. Upjohn*, 115 F.R.D. at 542, and the Supreme Court has cautioned that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) (footnote omitted). Claims involving theories novel to state law should, therefore, be left to state courts.

Count III of plaintiff's complaint alleges illegal insider trading by defendant Fomon under §§ 10(b) and 20(d) of the Exchange Act.[5] Plaintiff contends that Fomon sold 55,500 shares of Hutton common stock on October 20, 1987, traded in Hutton put and call options and exercised put options[6] from August 27 through December 1, 1987

based on material nonpublic information that Hutton's stock price was inflated and that a merger at a lower price was being negotiated. Defendant Fomon challenges plaintiff's standing to assert this claim on the grounds that plaintiff's was not a "contemporaneous trader" and therefore not a typical class member.

It is axiomatic that plaintiff must have standing to represent a class by showing that he has been personally injured, and not that an injury has been suffered by other unidentified members of the class. *Warth v. Seldin*, 422 U.S. 490, 502, 95 S.Ct. 2197, 2207, 45 L.Ed.2d 343 (1975). Defendants' claim that Moskowitz did not trade contemporaneously with him and therefore could not have been injured by any alleged insider trading presents a threshold issue of standing subject to disposition at the class action stage.

In *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), the Supreme Court adopted the rule of *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952) that standing under Rule 10b–5 is limited to "purchasers and sellers" of securities. It is now beyond peradventure that option traders are within this class. *See* 15 U.S.C. § 78t(d). *See also Deutschman v. Beneficial Corp.*, 841 F.2d 502, 507 (3d Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 3176, 104 L.Ed.2d 1037

---

**5.** Section 20(d) was added to the Exchange Act by enactment of the Insider Trading Sanctions Act of 1984, Pub.L. No. 98–376, 98 Stat. 1265 (1984) codified as amended at 15 U.S.C. § 78t(d). It provides:

Wherever communicating, or purchasing or selling a security while in possession of, material nonpublic information would violate, or result in liability to any purchaser or seller of the security under any provision of this chapter, or any rule or regulation thereunder, such conduct in connection with a purchase or sale of a put, call, straddle, option, or privilege with respect to such security or with respect to a group or index of securities including such security, shall also violate and result in comparable liability to any purchaser or seller of that security under such provision, rule, or regulation.

15 *U.S.C.* § 78t(d).

**6.** An option is a contract giving the holder (buyer) of the option the right, but not the obligation, to buy from or sell to the writer (seller) of the option a specified number of securities at a particular price (the "exercise price" or "striking price") within a given period of time (the "exercise period"). In exchange for assuming the risk of having to buy or sell the underlying security at a disadvantageous price, the option writer charges the holder a price or "premium" for the option. *See* R. Brealy & S. Myers, *Principles of Corporate Finance* 429–34 (2d ed. 1984).

A "call" option gives the holder of the option the right to purchase, or call for, the number of shares subject to the option contract at the strike price at any time during the exercise period. Conversely, a put option allows the holder to sell, or put to, the writer of the option the number of shares subject to the option contract at the strike price during the exercise period. *Id.*

(1989). The standing of option holders in insider trading cases, however, is further complicated by the two conditions of duty and causation.

In *SEC v. Texas Gulph Sulphur Co.*, 401 F.2d 833 (2d Cir.1968) (*en banc*), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969) the Second Circuit set forth the "disclose or abstain" rule for corporate insiders. In holding that corporate officers had violated Rule 10b–5 by trading in their company's securities with nonpublic information that the company had discovered a major ore reserve, the court stated that "anyone in possession of material information must either disclose it to the investing public, or, if he is disabled from disclosing it ..., or he chooses not to do so, must abstain from trading in or recommending the securities concerned while such inside information remains undisclosed." 401 F.2d at 848. This "disclose or abstain" rule did not include any limit on who an insider was liable to and left corporate insiders potentially liable to the entire marketplace.

The Supreme Court circumscribed this broad liability in *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980) and *Dirks v. SEC*, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). Read together, *Chiarella* and *Dirks* stand for the proposition that insider liability under Rule 10b–5 is limited to investors to whom the corporate insider owes a fiduciary duty.[7] This duty, of course, runs from corporate officers to shareholders of the corporation. It likewise runs to option holders where corporate officers make material misrepresentations to the marketplace. *See Deutschman*, 841 F.2d at 506–07 (holding that purchaser of option contract had standing to represent class for 10b–5 violation based on affirmative misrepresentations but distinguishing claim from insider trading case). However, the fiduciary duty of corporate officers to option holders in insider trading cases remains an unresolved issue in this circuit. *Id.*

Option holders differ fundamentally from shareholders in that they hold no tangible equity in the corporation. They do, however, serve a similar function as purchasers of corporate shares in the secondary market by reducing volatility and increasing the liquidity of a company's stock, thereby making it easier and more profitable for the company to raise capital by issuing shares in the primary market. *Deutschman*, 841 F.2d at 508. This is accomplished by transferring risk from present shareholders to the option holders by allowing shareholders to hedge the risk inherent in their equity investment. *See* Note, *Securities Regulation for a Changing Market: Option Trader Standing under Rule 10b–5* 97 Yale L.J. 623, 630–33 (1988). Consequently, it has been argued that "fiduciary obligations of insiders should follow this reallocation of risk, because it would be unfair to shift the risk of loss without a concomitant measure of legal protection." Note, *Private Causes of*

7. In *Chiarella* the Supreme Court reversed a criminal conviction under Rule 10b–5 against an employee of a financial printer who traded in a target companies' stock based on information he gleaned from documents delivered to the printer by the acquiring company. The Court reasoned:

> We cannot affirm petitioner's conviction without recognizing a general duty between all participants in market transactions to forgo actions based on material, nonpublic information. Formulation of such a broad duty, which departs radically from the established doctrine that duty arises from a specific relationship between two parties ... should not be undertaken absent some explicit evidence of Congressional intent.

445 U.S. at 233, 100 S.Ct. at 1117.

Similarly, in *Dirks*, the Court reversed an SEC censure against an officer of a broker-dealer who discussed with clients evidence of fraud amongst an insurance company's management which he had discovered based on a tip from an employee of the company. Relying heavily on *Chiarella*, the court held that a tipee's liability is derivative of the tipper and that a Rule 10b–5 violation is thus coextensive with the tipper's fiduciary duty. "[A] tipee assumes a fiduciary duty to the shareholders of a corporation not to trade on material nonpublic information only when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tipee and the tipee knows or should know that there has been a breach." 463 U.S. at 660, 103 S.Ct. at 3264. Since the corporate employee had exposed fraud within the company, he did not breach a fiduciary duty, *a fortiori*, neither could Dirks.

*Action for Option Investors under SEC Rule 10b–5: A Policy, Doctrinal, and Economic Analysis* 100 Harv.L.Rev. 1959, 1969 (1987). *But see Laventhall v. General Dynamics Corp.*, 704 F.2d 407, 410–12 (8th Cir.), *cert. denied,* 464 U.S. 846, 104 S.Ct. 150, 78 L.Ed.2d 140 (1983) (insiders owe no fiduciary duty to option traders); *Starkman v. Warner Communications, Inc.,* 671 F.Supp. 297 (S.D.N.Y.1987) (same). This interpretation of Rule 10b–5 is consistent with, and perhaps mandated by, the plain language of § 20(d).[8] *See* Wang, *A Cause of Action for Option Traders Against Insider Options Traders* 101 Harv.L.Rev. 1056 (1988).

The second restraint grafted on to the liability of corporate insiders is the concept of transaction causation. As discussed above, this provides the causal nexus between plaintiff's injury and defendant's conduct which had been traditionally served by the reliance requirement of Rule 10b–5. In the context of derivative securities, transaction causation requires proof of contemporaneous trading by the plaintiff and the insider. As explained by the court in *Wilson v. Comtech Telecommunications Corp.,* 648 F.2d 88 (2d Cir.1981), "[a]ny duty of disclosure is owed only to those investors trading contemporaneously with the insider; non-contemporaneous traders do not require the protection of the 'disclose or abstain' rule because they do not suffer the disadvantage of trading with someone who has superior access to information." 648 F.2d at 94–95.

But the meaning of contemporaneous trading between option traders is an elusive concept. Defendants concede that it does not require privity of contract where a plaintiff would be required to match his orders with those of the insider. *See Shapiro v. Merrill Lynch, Pierce, Fenner & Smith,* 495 F.2d 228, 236 (2d Cir.1974) ("it would make a mockery of the 'disclose or abstain' rule if we were to permit the fortuitous matching of buy and sell orders to determine whether a duty to disclose had

been violated."); *but see* Wang, *supra,* 101 Harv.L.Rev. at 1058–59 n. 12 (arguing that § 20(d) may require privity). It does, however, require the plaintiff to prove that he traded in either stocks or options during the period between the insider's trading and the date of disclosure. *See O'Connor & Associates v. Dean Witter Reynolds, Inc.,* 559 F.Supp. 800, 803 (S.D.N.Y.1983). This requirement acknowledges the inextricable interrelationship between the options and stock markets, *Deutschman,* 841 F.2d at 507–08, while simultaneously retaining the indisputable requirement of causation-in-fact; for although Rule 10b–5 "must be read flexibly, not technically and restrictively", *Superintendent of Ins. of State of New York v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971), it was not intended "to establish a scheme of investor's insurance." *List v. Fashion Park, Inc.,* 340 F.2d 457, 463 (2d Cir.), *cert. denied,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965).

Thus, this court rejects those cases following the Eighth Circuit's holding in *Laventhall v. General Dynamics Corp.* which finds no fiduciary duty between corporate insiders and holders of option contracts. The court finds that the interdependency of the stock and option markets requires corporate insiders to adhere to the "disclose or abstain" rule or face liability to option holders for insider trading.[9] An option holder plaintiff must also satisfy the causation element of a 10b–5 claim by showing that he traded during the period between the insider's first trade of the corporation's securities based on material nonpublic information and the date when the inside information was disclosed to the public.

■ Applying these principles to the facts at bar, the court finds that plaintiff has standing at this stage to represent the class on count III. In July 1987, plaintiff purchased two call option contracts: 1) a 2 October 35 call option, and 2) a 2 October 40 call option.[10] The premium which plain-

---

8. *See supra* note 4.

9. The court also believes this to be a logical extension of the Third Circuit's holding in *Deutschman.*

10. An option series is identified by its exercise price and expiration date and is usually designated by hundred-share lots. Thus, a 2 October 35 call option allowed plaintiff to purchase 200

tiff paid for these options could not have been affected by defendant since the complaint does not allege insider trades until August 27, 1987. *See* Amended Complaint, ¶ 38. Consequently, plaintiff has no standing as an option *purchaser* because he did not trade contemporaneously with Fomon.

On October 14, 1987, plaintiff exercised his October 35 call option and purchased 200 shares of Hutton common stock at $35.00 per share. He also allowed his October 40 calls to expire unexercised. This exercise of his October 35 call option is within the period of insider trading, which is alleged to have occurred from August 21, 1987 through at least October 30, 1987.[11] The question then becomes whether Fomon's insider trading in options between August 21 and October 14 impacted upon plaintiff as the holder of a call option contract, and later as the purchaser of 200 shares of Hutton stock. The court believes that plaintiff should have the opportunity to prove injury and that standing exists for class certification purposes. This, however, may not prove an easy task.

Certainly, a purchaser of stock is injured by insider trading in that stock. An option trader is likewise injured by insider trading in the underlying shares since the price of the option is directly related to the price of the stock. The impact which options trading has on the price of a corporation's shares is a much more tenuous proposition. Plaintiff will therefore be required to prove that his rights as an option *holder* between August 21 and October 14, 1987 were somehow injured, or that a cause of action exists for him to sue under §§ 10(b) and 20(d) as a purchaser of 200 shares of stock on October 14. The court notes that these

issues are the subject of a pending motion to dismiss count III and the parties are hereby invited to submit supplemental briefs on this point in light of this opinion.[12]

### 4. *Adequacy*

■ Rule 23(a)(4) requires a class representative to fairly and adequately represent the interests of the class. Defendants do not challenge the ability of plaintiff's counsel in this matter and their claim that plaintiff's interests are antagonistic to those of the class were resolved by the court under its discussion of typicality. Hence, the two traditional requirements of adequacy have been met. *See Weiss v. York Hosp.*, 745 F.2d 786, 811 (3d Cir. 1984), *cert. denied*, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985). Defendants do, however, raise one issue with serious implications for plaintiff's adequacy as a class representative.

Plaintiff is 81 years old. On May 11, 1989, he suffered a heart attack which has rendered him incapable of being deposed in the foreseeable future. *See* Report of Dr. David M. Schreck, annexed as Exhibit D to the Affidavit of Jonathan D. Bassett, Esq. in support of E.F. Hutton's Memorandum in Opposition to Class Certification ("Hutton Memorandum"). Defendants contend that plaintiff's ill health prevents him from adequately representing the interests of class members since he will have "no further substantive role to play in this litigation." Hutton Memorandum, at 23.

In response, plaintiff has submitted a personal declaration in which he states his intention to maintain an active role throughout this litigation and that he is prepared to submit to a telephone deposi-

---

shares of Hutton common stock for $35.00 per share, which expired in October.

**11.** To the extent plaintiff argues that his decision not to exercise his October 40 call option was affected by Fomon's insider trading, such claim must fail for want of injury. Fomon is alleged to have traded on information that the price of Hutton stock was artificially *inflated.* If he had disclosed before trading as required by *Texas Gulph Sulphur,* the price of Hutton stock under these circumstances would have decreased, making plaintiff's October 40 call option less, not more, valuable.

**12.** The court additionally notes that plaintiff alleges a sale by Fomon of 55,500 shares of Hutton common stock on October 20, 1987. Plaintiff claims that the exercise of his call option, and concomitant purchase of 200 shares of Hutton common stock, is contemporaneous with this sale since his settlement date was not until October 21, 1987. However, Fomon's settlement on his sale did not take place until October 28, 1987. The court can find no reason for comparing plaintiff's settlement date with defendant's date of sale to create contemporaneous trading. Accordingly, Fomon's October 20 sale is irrelevant for purposes of plaintiff's motion.

tion by defendants. *See* Declaration and Supplementation of Interrogatory Responses of George Moskowitz annexed as Exhibit A to Plaintiff's Reply Memorandum in Support of His Amended Motion for Class Certification ("Moskowitz Declaration"), at ¶ 5. Furthermore, plaintiff has provided detailed answers to interrogatories and has made his son and personal broker, Joel Moskowitz, available for deposition. Plaintiff claims that this makes him an adequate class representative in a fraud-on-the-market case and is sufficient to satisfy defendants discovery needs.

The testimony of a named class representative is less crucial in a securities fraud case which uses the fraud-on-the-market theory to establish reliance. *Wolfson v. Hammer*, No. 87–8471, slip op. (E.D.Pa. June 16, 1989) (Giles, J.). However, the court is mindful that fraud-on-the-market merely creates a presumption of reliance and that defendants have attacked that presumption based on Moskowitz's trading patterns, which necessarily requires an inquiry into his intent. The court is also aware that interrogatory responses can be a poor substitute for the give-and-take of a live deposition. Keeping in mind that it is defendants' burden to prove inadequacy, *Fickinger v. C.I. Planning Corp.*, 103 F.R.D. 529, 533 (E.D.Pa.1984), the court will certify plaintiff as an adequate class representative at this juncture. This issue may be revisited upon a particularized showing by defendants to the Special Master as to the precise discovery which defendants cannot obtain. The court will take up any remedial measures at that time.

### 5. *Predominance and Superiority*

 Plaintiff's claim must also satisfy the Rule 23(b)(3) predominance requirement. The only individual questions in this case involve reliance and damages. Their importance fails to outweigh the common questions of whether defendants defrauded the class by artificially inflating the price of Hutton stock, and as to count III, whether defendant Fomon traded on inside information. In determining whether common questions predominate, the court's inquiry is directed primarily toward the issue of liability. *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir.1977), *cert.*

*denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). The common questions and their predominance over individual claims are exemplified by the fact that if plaintiff and every class member were to bring an individual action, they would still be required to show the omissions or misrepresentations, and Fomon's knowledge during his trading activity, in order to prove liability.

In this case the class action device is superior to other methods of adjudication. Joinder of all class members would be impracticable and duplicative individual trials would impose inordinate burdens on the litigants and the court. The utility of presenting these claims through the class action method is great since "a large number of individuals have been injured, although no one person may have been damaged to a degree which would have induced him to institute litigation solely on his own behalf." *Green v. Wolf Corp.*, *supra*, 406 F.2d at 296.

Having satisfied all the requirements of Fed.R.Civ.P. 23, plaintiff's motion for class certification under § 10(b) of the Securities Exchange Act will be granted.

### B. Attorney–Client Privilege

All defendants have answered several of plaintiff's discovery requests stating that they refuse production based on the attorney-client privilege. Although no formal motion has been filed, the issue has been raised before the Special Master and before the court during status conferences. Consequently, the court will treat plaintiff's requests as a motion to compel under Fed. R.Civ.P. 37.

 Plaintiff claims that his status as a shareholder of the E.F. Hutton precludes defendants from asserting the attorney-client privilege against him. He relies on the seminal case of *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir.1970), *cert. denied*, 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971), in which the Fifth Circuit held that in a suit by shareholders against corporate management, the attorney-client privilege is "subject to the right

of stockholders to show cause why it should not be invoked in the particular instance." 430 F.2d at 1103–04. The *Garner* court listed a series of factors which a district courts should consider in determining whether the privilege applies. They include: (1) the number of shareholders and the percentage of stock they represent; (2) the bona fides of the shareholders; (3) the nature of the shareholders claim and whether it is obviously recoverable; (4) the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources; (5) whether, if the shareholders' claim is of wrongful action by the corporation, it is of action criminal, or illegal but not criminal, or of doubtful legality; (6) whether the communication related to past or to prospective actions; (7) whether the communication is of advice concerning the litigation itself; (8) the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; and (9) the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons. *Id.* at 1104.

Several courts have questioned the application of the *Garner* doctrine in nonderivative class action suits under Rule 10b–5, an instance where plaintiffs' interests are often inimical to those of the corporation. *See, e.g., Ward v. Succession of Freeman,* 854 F.2d 780, 784–85 (5th Cir.1988); *Weil v. Investment/Indicators Research and Management, Inc.,* 647 F.2d 18, 23 (9th Cir.1981); *In re Atlantic Mgt. Securities Litigation,* 121 F.R.D. 141, 146 (D.Mass. 1988); *Lefkowitz v. Duquesne Light Co.,* No. 86–1756 slip op. (W.D.Pa. June 14, 1988) (Ziegler, J.); *Shirvani v. Capital Investing Corp.,* 112 F.R.D. 389, 390–91 (D.Conn.1986). Under this interpretation, there must be some fiduciary relationship and a mutuality of interest at the time the privileged communications were made for the *Garner* rationale to apply. *See* Alexander, *The Corporate Attorney–Client Privilege: A Study of the Participants* 63 St.John's L.Rev. 191, 365 (1989) ("nonderi-

vative claims are somewhat more suspect than derivative claims because of the diminished mutuality of interests between the plaintiff's and the corporation.").

Despite authority in this district to the contrary, *see Cohen v. Uniroyal, Inc.,* 80 F.R.D. 480 (E.D.Pa.1978) (*Garner* applies to 10b–5 suits regardless of fiduciary relationship or presence of derivative claim), this court finds the existence of a fiduciary duty or mutuality of interest dispositive to the application of the *Garner* doctrine. Since the decision in *Cohen,* litigation under Rule 10b–5 has been proliferous, *Blue Chip Stamps v. Manor Drug Stores, supra,* 421 U.S. at 737, 95 S.Ct. at 1926. ("When we deal with private actions under Rule 10b–5, we deal with a judicial oak which has grown from little more than a legislative acorn."). To expose otherwise privileged communications between corporate management and corporate counsel to wholesale invasion without some showing of a fiduciary duty to the plaintiff is to engage in an anachronistic legal fiction with serious consequences to the efficacious and just management of corporate affairs.

The corporate attorney-client privilege is thus a qualified privilege. *See* Alexander, *supra,* 63 St. John's L.Rev. at 368–413. It can be overcome by the existence of a mutuality of interest between plaintiff and the corporation and its management at the time of the alleged communications, plus positive application of the *Garner* factors. Since it appears from the record before the court that plaintiff was not a shareholder at the time of the communications in question, the motion for wholesale production will be denied. This motion is thus referred to the Special Master to determine the application of the privilege in accordance with the principles set forth above.

 It should be noted, however, that several individual defendants have asserted reliance on the advice of corporate counsel as a defense to plaintiff's complaint. To the extent that this defense is asserted, defendants are deemed to have waived the

privilege "with respect to all documents and communications upon which defendants ... could reasonably have been said to rely, together with all documents and communications relating to the subject matter of the attorney's advice." *In re National Smelting of New Jersey, Inc. Bondholders' Litigation*, 722 F.Supp. 152, 162 (D.N.J.1989) (Simandle, J.). Although in theory the privilege belongs to the corporation, fairness dictates that it be waived where a corporate officer asserts the reliance on counsel defense. *Id.* at 164; *Jonathan Corp. v. Prime Computer, Inc.*, 114 F.R.D. 693 (E.D.Va.1987); *Panter v. Marshall Field & Co.*, 80 F.R.D. 718 (N.D.Ill. 1978). Plaintiff's cannot be stonewalled by the simultaneous assertion of the defense and the privilege.

## II. CONCLUSION

In sum, plaintiff has met the requirements of Fed.R.Civ.P. 23 for class certification on counts I and III. Issues of reliance and injury are better left to a more developed phase of this litigation. Plaintiff has not, however, met the requirements of class certification on count II for the reasons set forth above. Plaintiff's motion for wholesale production of privileged communications between defendants and corporate counsel is denied. This privilege is waived to the extent that individual defendants assert the defense of reliance upon the advice of counsel. This motion is remanded to the Special Master to determine application of the principles set forth above.