Forrest Kelly CLAY, Individually and on behalf of all those similarly situated, Plaintiff,

v.

RIVERWOOD INTERNATIONAL CORPORATION, Thomas H. Johnson, Robert C. Hart, Robert Healy Burg, and Frank R. McCauley, Defendants.

No. 1:95–CV–3147–CAM.

United States District Court, N.D. Georgia, Atlanta Division.

May 28, 1997.

W. Pitts Carr, Jan Reneé Kastanakis, Carr, Tabb & Pope, Atlanta, GA, Phillip A. Davis, Sheppard, Mullin, Richter & Hampton, Los Angeles, CA, for Plaintiff.

John J. Dalton, Troutman Sanders, Atlanta, GA, Robert E. Zimet, Skadden, Arps, Slate, Meagher & Flom, New York City, David W. Rivkin, John H. Hall, Alexander A. Yanos, Debevoise & Plimpton, New York City, for Defendants.

### ORDER

MOYE, District Judge.

Plaintiff Forrest Kelly Clay brought this suit alleging violations of the Securities Exchange Act of 1934 relating to the leveraged buyout of Riverwood International Corporation (Riverwood). The case is before the court on Defendants' motions for summary judgment and to compel discovery and on Plaintiff's motions for a protective order, to compel discovery, and for additional discovery. For the reasons stated below, the court GRANTS Defendants' motion for summary judgment and DENIES all other motions.

### BACKGROUND

#### I. General Factual Information

Riverwood is a global packaging, paperboard, and packaging machinery company. Approximately 81 percent of the Riverwood outstanding common stock was held by Manville Corporation (Manville) during the relevant time period, and Manville maintained effective control over Riverwood. Defendant Thomas H. Johnson was Riverwood's President and Chief Executive Officer during the relevant time period. Defendants Robert C. Hart, Robert Healy Burg, and Frank R. McCauley were Senior Vice Presidents of Riverwood during the relevant time period.

At a joint meeting of the boards of directors of Riverwood and Manville on April 6 and 7, 1995, a joint special committee (Special Committee) [1] was created to consider the strategic alternatives available to Riverwood to enhance value to stockholders, particularly in light of Manville's pressing financial needs arising from wide-spread asbestos litigation in which it had been involved. Those alternatives were perceived by Riverwood as ranging from maintaining the status quo, with perhaps additional debt, to sale or merger of the entire company, and the possibility of Manville's selling its 81 percent stock interest as well as Manville's buying back the publicly held stock. [2] On April 10, Riverwood and Manville jointly retained J.P. Morgan & Co., Inc. and Goldman Sachs & Co. to assist in reviewing and evaluating those strategic alternatives. On April 17, Riverwood issued a press release announcing that it was "considering strategic alternatives which may be available to it and in the best interest of shareholders." The press release further announced that J.P. Morgan and Goldman Sachs were assisting in the review and that no decision had been made as to what form any such transaction might take.

In late May and early June, J.P. Morgan and Goldman Sachs were instructed to contact forest products companies to determine whether any of them was interested in acquiring Riverwood. For those who expressed an interest and signed confidentiality agreements, Riverwood prepared confidential

---

1. None of the individual defendants were on the Special Committee. As President and CEO of Riverwood, Johnson was a member of the Riverwood board of directors and attended board meetings where the strategic alternatives were discussed. At the request of the Special Committee, Johnson also attended some Special Committee meetings to give advice with respect to the operations and financial affairs of Riverwood.

2. Manville Forest Products, a wholly owned subsidiary of Manville became Riverwood International Corporation in the early 1990's, and the initial public stock offering was in June 1992.

memoranda including further information about Riverwood. Oral management presentations were held in early June for six interested entities. On June 19, J.P. Morgan and Goldman Sachs requested preliminary indications of interest from those entities still interested. On June 28, preliminary indications of interest were received from Georgia Pacific Corporation, International Paper Company, and a consortium initially led by a Brazilian forest products company, Companhia Suzano de Papel e Celulose, and later led by Clayton, Dubilier & Rice, Inc. (CD & R). Georgia Pacific and International Paper each indicated interest in an all cash transaction,[3] and neither proposed transaction was subject to securing adequate financing. The consortium, however, contemplated a merger involving both cash and an equity interest in the surviving corporation,[4] and the proposed transaction also was subject to a financing condition. These preliminary indications of interest, as well as information regarding discussions with entities which had not submitted preliminary indications of interest, were presented to the Special Committee on June 30, 1995. During July, Georgia Pacific, International Paper, and the consortium were provided additional access to confidential information about Riverwood as well as to Riverwood's management and facilities. On July 19, a fourth preliminary indication of interest was received from Stora Kopparbergs, a Swedish corporation.[5] Stora was also provided access to additional confidential information and to Riverwood's management and facilities.

On July 20, Riverwood released its second quarter financial results. As part of the press release, Riverwood reiterated that it was reviewing strategic alternatives and further announced that one alternative was the possible sale or merger of Riverwood and that J.P. Morgan and Goldman Sachs were contacting potential buyers and working closely with Riverwood management to evaluate that alternative.

On August 17, 1995, Johnson advised the Special Committee that the consortium had determined the equity participation levels for its members, with CD & R having the largest equity position.[6] Because CD & R had expressed an interest in exploring the possibility of senior management equity participation in the transaction, the Special Committee decided to limit CD & R's access to Riverwood's management at that time.

The four entities which continued to express an interest were requested to submit final, non-binding bids by August 30. On August 30, the consortium submitted a proposal, subject to several conditions, to acquire Riverwood through a merger transaction.[7] A written proposal was later received from Georgia Pacific,[8] and International Paper made an oral expression of interest.[9] The Special Committee decided not to pursue any of the proposals, but instructed J.P. Morgan and Goldman Sachs to continue discussions with the various interested entities in an effort to obtain a more favorable proposal. On September 10, the Special Committee, in order to induce a more definite proposal from the consortium, authorized Riverwood senior management to discuss an equity participation transaction with CD &

---

3. Georgia Pacific contemplated a transaction within a range of values from $21 to $26 per share. International Paper contemplated a transaction within a range of values from $20 to $25 per share. Proxy Statement of the Merger at 18.

4. The consortium contemplated a transaction within a range of values from $24 to $25.50 per share with a cash portion of not less than $21 per share. *Id.*

5. Stora contemplated a transaction within a range of values from $18 to $22 per share, and the transaction was subject to a financing condition. *Id.* at 19.

6. The Brazilian forest products company had dropped out of the consortium after entering a joint venture with Boise Cascade.

7. Stockholders would receive consideration of up to $24.50 per share in cash or a combination of cash ($21 to $22 per share) and equity or debt securities. *Id.*

8. The proposal anticipated a transaction at $20 per share reduced, pro rata, for certain taxes. *Id.*

9. The anticipated transaction price was less than that offered by the consortium.

R.[10] Following this authorization, Johnson no longer attended Special Committee meetings and was not given information about discussions with other potential buyers.

During September 1995, Clay purchased 36,400 shares of Riverwood common stock. Prices ranged from $23⅛ to $26⅛ per share.

Throughout September and early October, J.P. Morgan and Goldman Sachs continued discussions with Georgia Pacific, International Paper, and the consortium. During October, representatives of Riverwood and Manville met with representatives of the consortium to negotiate specific terms of its proposed transaction, which included equity participation by Riverwood's senior management. On October 19, Riverwood released its third quarter financial results. As part of that press release, Riverwood reiterated its previous announcement that it was reviewing strategic alternatives and that one alternative was the possible sale or merger of Riverwood. On October 25, the Riverwood and Manville boards of directors, J.P. Morgan and Goldman Sachs, and legal counsel met to consider the consortium's proposal as well as other available alternatives.[11] The Riverwood board determined that the consortium's proposal was fair to and in the best interest of the stockholders, approved the proposal, and decided to recommend to the stockholders that they approve the transaction. The Manville board approved Manville's disposition of its Riverwood stock and decided to recommend to its stockholders that they approve the transaction. On October 26, 1995, Riverwood announced an agreement under which the consortium[12] would purchase Riverwood for $20.25 per share in cash.[13] Subject to financing and other conditions, including approval by Riverwood and Manville shareholders, the deal was expected to be completed early in 1996. It was anticipated that substantially all of Riverwood's existing debt would be refinanced and that the new financial flexibility would enable Riverwood to continue to implement its existing goals and strategies.

The transaction proposed by the consortium led by CD & R was approved. Clay's shares in Riverwood were redeemed as a part of the transaction.

## II. *News Articles*

Throughout the time period during which various alternatives were being reviewed, the financial press published articles speculating both on the parties interested in acquiring Riverwood and on the price at which a transaction might be concluded. On May 9, 1995, Bloomberg, a financial news service, reported that "individuals involved in the negotiations" had released information that Georgia Pacific was planning to bid on at least Manville's interest in Riverwood and that International Paper had also expressed an interest, but added that "[o]fficials at both Georgia–Pacific and Riverwood declined to comment as a matter of policy." On July 19, Bloomberg reported that "executives close to the two Atlanta-based companies" had said Georgia Pacific planned to bid $25 for Manville's share in Riverwood.[14] On August 16, the Wall Street Journal reported that there were four companies considering buying Riverwood; that "analysts who follow the Compa-

10. CD & R, which was not a forest products company and had originally planned to be a passive financial investor, needed the operating expertise of Riverwood's senior management.

11. Johnson excused himself from the meeting because of the personal interest he now had in the consortium's proposed transaction.

12. The consortium or investor group was led by CD & R and included the 1818 Fund II of Brown Brothers Harriman & Co. and the individual defendants as well as other members of Riverwood senior management. The individual defendants continue to hold the same corporate positions they held before Riverwood was sold.

13. On October 3, the Consortium had proposed a transaction of $21.00 per share in cash for each outstanding share of common stock. *Id.* at 21. The $20.25 per share purchase price reflected the $21.00 per share offer reduced by $.75 per share to cover taxes payable as a result of an election to treat the transaction as a sale of assets. *Id.* at 23.

14. Since the report identifies Manville as "Denver-based," the "two Atlanta-based companies" would be Georgia Pacific and Riverwood. The precise wording and the location of the comment within the report suggest that the information was not new and that the comment referred back to information provided in the May 9 report.

ny" believed Riverwood would sell for as much as $30 per share; and that all of the companies interested in Riverwood were forest products companies. On October 20, Reuters reported that Riverwood was having trouble finding a buyer and added that neither Manville nor Riverwood would comment. On October 24, the Atlanta Constitution reported that analysts were concerned at the length of time it was taking Riverwood to make an announcement about its plans.

### III. Stock Appreciation Rights

In March 1993, Riverwood granted each of twenty-three executives, including the individual defendants, a specified number of Stock Appreciation Rights (SARs), each entitling the recipient to a payment from Riverwood equal to the difference between the grant value of the SAR and the fair market value of Riverwood stock on the date the executive exercised the SAR. The value of the SARs was payable in cash or stock, at Riverwood's discretion. The agreement granting the SARs expressly stated that the rights were "not granted in tandem with any Option, [did] not relate to any Option or other Awards granted under the [1992 Long Term Incentive Plan]"; that the recipient did not have any stockholder rights with respect to the SARs; and that the SARs were not offers to sell securities of Riverwood.

On December 1, 1994, Riverwood granted each of thirty executives, including the individual defendants, a specified number of Premium Stock Appreciation Rights (PSARs), each entitling the recipient to a payment from Riverwood equal to the difference between the grant value of the PSAR and the fair market value of Riverwood stock on the date the executive exercised the PSAR. The value of the PSARs was payable only in cash. As with the SARs, the agreement granting the PSARs expressly stated that the recipient did not have any stockholder rights with respect to the PSARs.

On September 21, 1995, all of the individual defendants, as well as other Riverwood executives, exercised both SARs and PSARs. All payments were made in cash. The individual defendants held additional SARs or PSARs which were not exercised at that time

even though they were "in-the-money," i.e. had a positive cash value.

### IV. Procedural Background

Clay filed this class action suit on December 6, 1995. In late December 1995 or early January 1996, without regard to Fed.R.Civ.P. 26(d), he served subpoenas upon non-parties Georgia Pacific, International Paper, J.P. Morgan, Goldman Sachs, and Manville commanding the production of numerous documents. Later, at a scheduling conference on January 17 and by motion filed January 18, he sought the Court's permission to enforce the subpoenas he prematurely served. On January 22, the Court entered Pretrial Order No. 1, declaring its supervision over discovery, ordering that all documents maintained by Defendants be preserved, permitting Clay to file a motion for class certification, and staying the third-party subpoenas. Clay filed a motion for class certification on January 23.

On January 29, Defendants filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). A hearing was held on March 25, and on March 26, the Court issued an order denying Defendants' motion to dismiss, deferring Clay's motion for class certification, and granting limited discovery: (1) Defendants were granted permission to depose Clay; (2) Clay was granted permission to depose Hart, Burg, and McCauley as to "their knowledge of the facts and circumstances including the sources of information for the news releases" and "the facts and circumstances regarding the nature of the transactions by the individual defendants' exercise of their stock appreciation rights"; and (3) Clay was granted permission to depose Johnson and Riverwood under Fed.R.Civ.P. 30(b)(6) through Johnson after a conference with the Court as to the scope of the depositions. The Court denied, subject to further conference with the Court, other discovery Clay had requested, including third party discovery from Manville, Georgia Pacific, and International Paper.

On April 4, 1996, Clay filed his First Amended Complaint. On April 24, Defendants filed their answer. On May 6, the Court denied Clay's motions for leave to

serve third-party subpoenas and for class certification. Defendants deposed Clay on May 9.

On July 1, Defendants filed a motion to compel, which is currently before the Court, seeking certain documents and information about Clay's investment history. On July 18, Clay sought a protective order, which is currently before the Court. Clay deposed Burg on July 11 and Hart and McCauley on July 12. On August 7, Clay filed a motion seeking a scheduling order permitting him to conduct additional discovery, including the deposition of Johnson. A hearing was held on August 22 at which the Court granted permission for Clay to take the deposition of Johnson as an individual but not as a Rule 30(b)(6) witness; directed Defendants to file a motion for summary judgment on all claims within twenty days after the deposition; directed Clay to file a response, including a Rule 56(f) motion if necessary, within thirty days; directed Defendants to file their reply within fifteen days; and indicated that the motion for class certification would be addressed later. The Court further directed Clay to specify in his Rule 56(f) motion "the very precise piece[s] of information" he needed. On August 29, as a "housekeeping" measure relating to the issues resolved at the hearing, the Court entered Pretrial Order No. 3, granting Clay permission to depose Johnson on the same limited issues as the other individual defendants, and specifying the timeframe for Defendants' motion for summary judgment and the responses thereto. The Court chose the approach of limiting discovery to that information necessary to address the specific issues currently before the Court because, at the time, it appeared an early decision as to the applicability to the SARs and PSARs here involved of the developed body of statutory and case law relating to insider trading would be of critical importance and might eliminate a substantial volume of discovery enthusiastically begun in classic big-case, class action style.

On September 18, Clay filed a motion to compel, which is currently before the Court,

seeking the production of various documents which Defendants had listed as "privileged." Clay deposed Johnson on September 20.

On October 23, Clay filed his Second Amended Complaint. On November 1, Defendants filed a motion for summary judgment, which is currently before the Court. On December 6, Clay filed a Rule 56(f) motion to allow additional discovery, which is currently before the Court.

## LEGAL STANDARDS AND ANALYSIS

### I. Rule 56(f) Motion

In response to Defendants' motion for summary judgment, Clay filed a Rule 56(f) motion seeking the following additional discovery: (1) documents and depositions from all the companies involved in the bidding process regarding the status of the strategic alternatives process and the information held by Defendants on September 21, 1995; (2) depositions of all Special Committee members and all Riverwood board members regarding all facts and circumstances surrounding the strategic alternatives process and Defendants' exercise of their SARs and PSARs; (3) Rule 30(b)(6) depositions of Riverwood and Manville regarding the facts and circumstances of the strategic process, Defendants' exercise of their SARs and PSARs, and communications with analysts and the press; (4) depositions of Jonna Manes, Steve Beabout, and Bob Falise regarding sources of news releases and all disclosure to the press and of reporters Adam Levy, Robert Luke, Hank Ezell, Emory Thomas, and Steven Zipin on the same issues. With respect to none of the proposed discovery does plaintiff show the Court that there is even some basis for believing additional, relevant, material information actually exists simply awaiting discovery, or that all the relevant, material facts (at least as pertain to the issues now before the Court) are not now in the record.

█ Rule 56(f) [15] permits a party "to survive a summary judgment motion if he pres-

---

**15.** Rule 56(f) states:

> **When Affidavits are Unavailable.** Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons

stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be

ents valid reasons justifying his failure of proof" opposing the motion. *Wallace v. Brownell Pontiac–GMC Co.,* 703 F.2d 525, 527 (11th Cir.1983).

> [T]he nonmovant may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts, but rather he must specifically demonstrate how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact.

*Id.* (quotations omitted). Permitting additional discovery is within the discretion of the Court. *Id.* Denial of a Rule 56(f) motion "is generally disfavored where the party opposing summary judgment makes (a) a timely application which (b) specifically identifies (c) relevant information, (d) where there is some basis for believing that the information sought actually exists." *VISA Int'l Serv. Ass'n v. Bankcard Holders America,* 784 F.2d 1472, 1475 (9th Cir.1986). A Rule 56(f) motion should be denied, however, if "the evidence sought [is] almost certainly nonexistent or [is] the object of pure speculation." *Id.*

■ Due to the specific nature of the SARs and PSARs, there appears to be no transactional nexus between the individual defendants' exercise of the SARs and PSARs and Clay's purchase of Riverwood stock. As pointed out above, consideration of the substantial factual differences between the issues in this case and reported cases involving insider trading has led the Court to expedite decision on the apparently hitherto unresolved issue whether the exercise of the SARs and PSARs here involved (which in fact did not require the issue, sale, or purchase of any Riverwood stock although the corporation in its discretion apparently could have issued stock to cover the exercise of the SARs but not the PSARs) can implicate the

concerns relating to insider trading (see Section III below). The Rule 56(f) motion does not indicate any probability of providing information which would assist in resolving this issue.

Nor does it indicate any probability of providing information which would assist in resolving the issues relating to the press releases and news articles (see Section IV below). In determining whether the Riverwood press releases became false or misleading, the Court must consider the text of the press releases and the exact nature of the transaction which actually occurred. This information is of record, and Clay fails to show that any information he seeks through additional discovery would assist the Court in considering the issue. As for the news articles attributing information to anonymous sources, the Court must consider whether Defendants were the source of the information contained in the articles. Further, the Court must determine whether Clay has stated this claim with the particularity required by Fed.R.Civ.P. 9(b). The discovery allowed by the Court was broad enough for Clay to discover at least the suggestion of a connection between the news articles and either Riverwood or the individual defendants [16] if any connection existed. Clay was permitted to and did question the individual defendants about the news articles and the sources for the information contained therein, including any discussions or meetings with the news or financial analysts. All the evidence of record, both documentary and testamentary, suggests that neither the individual defendants nor any Riverwood spokesperson either provided or confirmed the information contained in the news articles.[17] Clay has failed to show the Court that any of the additional discovery he seeks might produce results sufficient to create a genuine issue of material fact as to this issue.

---

obtained or depositions to be taken or discovery to be had or may make such other order as is just.
Fed.R.Civ.P. 56(f).

**16.** Burg was responsible for corporate communications and public affairs. The corporate communications personnel of Riverwood reported to him, and public affairs activities were his person-

al responsibility. Burg reported to Johnson, the president and chief executive officer. Burg and Johnson were questioned extensively about communications with financial and news analysts.

**17.** The evidence of record shows that Riverwood consistently, from the start, maintained a "no comment" policy regarding the strategic alternative process.

All facts necessary to the resolution of the issues before the Court are now of record. The Court therefore denies Clay's motion for additional discovery.

## II.  Summary Judgment

Courts should grant summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears "the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of [the record] 'together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). *See also, Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 159–60, 90 S.Ct. 1598, 1609–10, 26 L.Ed.2d 142 (1970); *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1437–38 (11th Cir.1991).

In meeting this initial responsibility, for issues on which the non-movant would bear the burden of proof at trial, the moving party may simply show that there is an absence of evidence to support the non-moving party's case. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence indicating that the non-moving party will be unable to prove its case at trial. *Four Parcels of Real Property,* 941 F.2d at 1438.

In determining whether the movant has met its burden, the court views the evidence in the light most favorable to the party opposing the motion. *Adickes,* 398 U.S. at 158–59, 90 S.Ct. at 1608–09. Moreover, "[r]easonable doubts as to the facts should be resolved in favor of the nonmoving party," *Borg–Warner Acceptance Corp. v. Davis,* 804 F.2d 1580, 1582 (11th Cir.1986), "and all justifiable inferences are to be drawn in his favor," *Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987).

Once the initial burden has been met the "burden shift[s] to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). At this point, "the non-moving party [must] go beyond the pleadings and by affidavits of [his or her] own, or by the 'depositions[,] answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Russ v. International Paper Co.,* 943 F.2d 589, 592 (5th Cir.1991)(quoting *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553), *cert. denied,* 503 U.S. 987, 112 S.Ct. 1675, 118 L.Ed.2d 393 (1992). *Accord, Four Parcels of Real Property,* 941 F.2d at 1437–38. Whether facts are material is determined by the applicable substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

For issues on which the non-movant would bear the burden of proof at trial and where the movant demonstrated an absence of evidence on the issue, the non-movant must respond either by

> show[ing] that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was "overlooked or ignored" by the moving party, ... [or by] com[ing] forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.

*Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1116–17 (11th Cir.1993).

## III.  Insider Trading

While Clay at one time alleged the individual defendants participated in insider trading on September 21, 1995, both by selling stock and by exercising their SARs and PSARs, there is now no issue as to the trading of stock separate from the exercise of SARs and PSARs for cash.[18]

18. In his original complaint, Clay alleged the individual defendants exercised options to purchase shares of Riverwood common stock and immediately sold those shares, but made no mention of the SARs and PSARs. He continued the same allegations in his first amended complaint, again making no reference to SARs and PSARs. In his second amended complaint, Clay added allegations regarding the individual defendants' exercise of stock appreciation rights but retained the allegations regarding their exercise of options to purchase stock and of their sales of stock. In

On September 21, 1995, the market price of Riverwood common stock was $25.25 per share. Clay alleges the individual defendants knew the price was inflated because the only bid resulting from the bidding process was $20.00 per share.

■ To protect stock market traders who must rely on publicly known information in making their securities decisions, § 20A of the Securities Exchange Act of 1934 prohibits the purchase or sale of securities by an insider who has material information not known to the public. 15 U.S.C. § 78t–1(a).[19] Only "contemporaneous" insider transactions are prohibited because "non-contemporaneous traders ... do not suffer the disadvantage of trading with someone who has superior access to information." *Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88, 94–95 (2d Cir.1981).[20] Similarly, only insider transactions involving "securities of the same class" are prohibited because traders of securities of different classes do not suffer because of the insider's superior access to information.

Clay purchased Riverwood common stock on September 21, 1995, the date the individual defendants exercised their SARs and PSARs. The individual defendants were paid cash from the company treasury for their SARs and PSARs; they neither purchased nor sold common stock.

Clay contends that § 20A liability, and therefore standing to bring the suit, derives from § 20(d) of the Securities Exchange Act.[21] He contends that each SAR or PSAR was a "privilege with respect to" Riverwood stock within the meaning of § 20(d), that pursuant thereto such privilege was for all purposes the legal equivalent of Riverwood stock so that exercise of the SARs or PSARs while in possession of material, nonpublic information violated the prohibition against insider trading and made Defendants liable to any contemporaneous trader in Riverwood stock. Relying on *Moskowitz v. Lopp*, 128 F.R.D. 624 (E.D.Pa.1989), Clay argues that § 20(d) mandates finding a contemporaneous trade in which the exercise of SARs and PSARs was the legal equivalent of the sale of Riverwood stock contemporaneous with his purchase of Riverwood stock. He contends that the terms of the Riverwood Long Term Incentive Plans provided "certain rights and privileges with respect to the common stock of Riverwood" sufficient to make the SARs and PSARs "privileges with respect to" the common stock.[22]

response to the motion for summary judgment, Clay argues only that the individual defendants exercised their SARs and PSARs.

**19.** Section 20A states:

Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court [of] competent jurisdiction to any person who, *contemporaneously* with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) *securities of the same class*.
15 U.S.C.A. § 78t–1(a) (West Supp.1996) (emphasis added).

**20.** *Wilson* was brought pursuant to § 10(b) and Rule 10b–5, not § 20A, which was not added to the Securities Exchange Act until 1988. In considering § 20A, however, Congress specifically cited *Wilson* as one source of the common law implied right of action in insider trading cases which the section would codify as an express right of action "for those who traded the same class of securities 'contemporaneously' with and

on the opposite side of the market from the insider trader." H.R.Rep. No. 100–910, at 26–27 (1988), *reprinted in* 1988 U.S.C.C.A.N. 6044, 6063–64.

**21.** Section 20(d) states:

Wherever communicating, or purchasing or selling a security while in possession of, material nonpublic information would violate, or result in liability to any purchaser or seller of the security under any provision of this chapter, or any rule or regulation thereunder, such conduct in connection with a purchase or sale of a put, call, straddle, option, or privilege with respect to such security or with respect to a group or index of securities including such security, shall also violate and result in comparable liability to any purchaser or seller of *that security* under such provision, rule, or regulation.
15 U.S.C. § 78t(d) (emphasis added).

**22.** The Court believes Clay's's citation to *Deutschman v. Beneficial Corp.*, 841 F.2d 502 (3rd Cir.1988), *cert. denied*, 490 U.S. 1114, 109 S.Ct. 3176, 104 L.Ed.2d 1037 (1989), is inapposite. *Deutschman* is a material misrepresentation case, not an insider trading case. The

The *Moskowitz* court considered the issue of whether an option holder who exercised one call option to purchase common stock and let another call option expire during the relevant time period had standing to bring an insider trading claim pursuant to §§ 10(b) and 20(d) against a corporate official who traded in options.[23] *Moskowitz*, 128 F.R.D. at 632–35. The court found that "the interdependency of the stock and option markets requires corporate insiders to adhere to the 'disclose or abstain' rule or face liability to option holders for insider trading." *Id.* at 634. In so finding, the court, citing § 20(d), noted that "[i]t is now beyond peradventure that options traders are within [the] class" of "purchasers and sellers" of securities who have standing under Rule 10b–5. *Id.* at 632. *Moskowitz*, however, is distinguishable from the case at bar in that it dealt with options, which are expressly included in the language of § 20(d) and for which there are markets "interdependent" with the stock markets, whereas the case at bar deals with stock appreciation rights, which are not expressly included in the language of § 20(d) and for which there is no market to be affected.

Section 20(d) was added to the Securities Exchange Act by the Insider Trading Sanctions Act of 1984 (ITSA). It was not included in the original House version of the ITSA but was added late in the legislative process by an amendment in the Senate. Harvey L. Pitt and Karl A Groskaufmanis, *A Tale of Two Instruments: Insider Trading in Non–Equity Securities*, 49 Bus. Law. 187, 198 (1993). The amendment was proposed to eliminate a perceived loophole in Rule 10b–5 liability for insider trading in the options market. *See id.* at 195–198. *See also*, William K.S. Wang, *A Cause of Action for Option Traders Against Insider Option Traders*, 101 Harv. L.Rev. 1056, 1057 n. 5 (1988). The loophole resulted from a Supreme Court decision that "[i]n order to be fraud [and subject to liability pursuant to § 10(b)], there must be a duty to speak emanating

from a fiduciary relationship," *A Tale of Two Instruments* at 197 (quoting *Chiarella v. United States*, 445 U.S. 222, 236, 100 S.Ct. 1108, 1118–19, 63 L.Ed.2d 348 (1980)), because there is no fiduciary relationship between corporate insiders and participants in the options markets whose holders are a step removed from the holders of the corporation's stock on whose advance or decline they speculate. In introducing the amendment, Senator Alfonse D'Amato emphasized that "[t]he misuse of material nonpublic information in *the derivative markets* threatens the integrity of and public confidence in, the Nation's securities markets in the same manner as any other abuse of confidential information." *Id.* at 198 (citing 130 Cong. Rec. 20108 (1984) (Statement of Sen. D'Amato)) (emphasis added). Similarly, discussion of the amendment in the House indicates the intent "to forestall the possibility of a loophole for insider trading in options." *Id.* at 199 (citing 130 Cong. Rec. 20968). Because Congress specified "that security" in the language near the end of § 20(d), commentators have concluded Congress intended to authorize "a private cause of action against insider option traders only for plaintiffs who had traded the equivalent option," providing options-trading plaintiffs a cause of action analogous to that available to stock-trading plaintiffs. *A Cause of Action for Option Traders* at 1057, 1059–60. *see also, A Tale of Two Instruments* at 211 ("[T]he most logical reading of section 20(d) limits an implied right of action to proceedings against other options traders.") The courts, however, are divided on the issue of whether an options trader can sue an insider stock trader. *A Cause of Action for Option Traders* at 1057 n. 2 (citing *Laventhall v. General Dynamics Corp.*, 704 F.2d 407 (8th Cir.), *cert. denied*, 464 U.S. 846, 104 S.Ct. 150, 78 L.Ed.2d 140 (1983); *Starkman v. Warner Communications, Inc.*, 671 F.Supp. 297, 301–07 (S.D.N.Y.1987); *Backman v. Polaroid Corp.*, 540 F.Supp. 667, 671

*Deutschman* court, specifically noted that, in contrast to insider trading cases which are "analytically distinct," "[n]o Supreme Court case and no Court of Appeals case has ever imposed a transactional nexus requirement in a section 10(b) affirmative misrepresentation case." *Id.* at 507.

**23.** Claims pursuant to § 20A were not available in *Moskowitz* because the actions at issue occurred prior to the November 19, 1988, effective date of § 20A. 15 U.S.C.A. § 78t–1, Historical and Statutory Notes (West Supp.1996).

(D.Mass.1982)). Although § 10(b), which "was intended to be a catch-all provision, vesting the Commission with flexibility to respond to new forms of manipulation or fraudulent conduct," *A Tale of Two Instruments* at 189, might permit varying interpretations of § 20(d), § 20A clearly does not.

■ Section 20A was added to the Securities Exchange Act by the Insider Trading and Securities Fraud Enforcement Act of 1988 (ITSFEA) "to codify a private right of action for 'contemporaneous traders.'" H.R.Rep. No. 100–910, at 7 (1988), *reprinted in* 1988 U.S.C.C.A.N. 6044.

> Although the courts [had] recognized an implied private right of action in insider trading cases, [§ 20A codified] an express right of action against insider traders and tippers for those who traded the same class of securities 'contemporaneously' with and on the opposite side of the market from the insider trader.

*Id.* at 26, 1988 U.S.C.C.A.N. at 6063. A definition of "contemporaneous" was intentionally omitted because a definition had "developed through case law." *Id.* at 27, 1988 U.S.C.C.A.N. at 6064 (citing *Wilson v. Comtech Telecom. Corp.*, 648 F.2d 88 (2d Cir. 1981); *Shapiro v. Merrill, Lynch, Pierce, Fenner and Smith, Inc.*, 495 F.2d 228 (2d Cir.1974); *O'Connor & Assoc. v. Dean Witter Reynolds, Inc.*, 559 F.Supp. 800 (S.D.N.Y. 1983)). Although Congress considered including an express private right of action for parties other than contemporaneous traders in the ITSFEA,[24] it declined to do so believing both that other provisions of the Securities Exchange Act were sufficiently flexible to provide the necessary protection and that limiting liability for damages caused by non-contemporaneous insider trading would be inappropriate as the potential harm might be "far greater than the profit gained or loss avoided by" the individual defendant. *Id.* at

27–28, 1988 U.S.C.C.A.N. at 6064–65; *see* 15 U.S.C. § 78t–1(b)(1). Interpreting § 20(d) as Clay suggests, to provide a trader of either stocks or derivative securities a right of action against an insider trader of either stocks or derivative securities, would, in essence, completely eliminate the "same class" requirement from § 20A(a).[25] The Court finds that § 20(d) does not eliminate the requirement within § 20A(a) for a transactional nexus between the plaintiff's sale or purchase and that of the insider defendants and, therefore, does not provide Clay the necessary standing to bring this action pursuant to § 20A.

The concept of a "transactional nexus" is fundamental to the concept of "insider trading" liability to other market participants. *See Wilson,* 648 F.2d at 94–95. "Trading" always involves a swap, money frequently being present on one side or both. The securities acts envision securities markets conforming to classic, Adam Smith, ideals, where willing buyers meet willing sellers, each possessing the same information. *See Basic, Inc. v. Levinson,* 485 U.S. 224, 246, 108 S.Ct. 978, 991, 99 L.Ed.2d 194 (1988) (quoting H.R.Rep. No. 1383, at 11) ("The idea of a free and open public market is built upon the theory that competing judgments of buyers and sellers as to the fair price of a security brings [*sic*] about a situation where the market price reflects as nearly as possible a just price.... [H]iding and secreting of important information obstructs the operation of markets as indices of real value."). In the context of modern, sophisticated, mass securities markets, restriction of insider trading activity has as its purpose the prevention of use by one participant of unfairly obtained information to affect the price balance which would be obtained if all market participants had the same information. *See Laventhall,* 704 F.2d at 412 ("The legal justification for

---

24. The proposed provision stated:

> Any person (other than a person entitled to recovery solely under paragraph (1) of this subsection [a contemporaneous trader].) injured by a violation described in such paragraphs in connection with such person's purchase or sale of securities may bring an action in any court of competent jurisdiction to seek recovery of any damages caused by such viola-

tion, or for appropriate equitable relief, or both.
*A Tale of Two Instruments at* 210 n. 156.

25. Plaintiffs who do not qualify as contemporaneous traders of securities of the same class pursuant to § 20A(a) are not prohibited from bringing actions pursuant to other provisions of the Securities Exchange Act. 15 U.S.C. § 78t–1(d).

liability of the corporate insider to the outside uninformed investor is that if the insider trades on the basis of the inside information it may profit at the expense of outside investors who are disadvantaged in the same or similar transaction by lack of the inside information.") *See also Basic, Inc.,* 485 U.S. at 230, 108 S.Ct. at 982–83 (The "fundamental purpose" of the Securities Exchange Act of 1934 is to implement "a philosophy of full disclosure.") (citations omitted); *Chiarella v. United States,* 445 U.S. 222, 227, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980) (The duty of a corporate insider to "abstain from trading in the shares of his corporation unless he has first disclosed all material inside information known to him" arises from "the unfairness of allowing a corporate insider to take advantage of that information by trading without disclosure."). But unless there is a transactional nexus, where one participant sells too high causing another participant to buy too high, or buys too low causing another to sell too low, the evil does not occur. *Laventhall,* 704 F.2d at 412. It is the physical act of purchasing or selling which affects the market even if the concept is extended to interdependent markets. *See, e.g. Moskowitz,* 128 F.R.D. at 634 (allowing options traders to assert insider trading claims against contemporaneous options traders); *Backman v. Polaroid Corp.,* 540 F.Supp. 667 (D.Mass. 1982) (declining to dismiss insider trading claim based on sale of common stock and contemporaneous purchase on the open market of call options).

Neither party has cited, and the Court has not found, any case addressing the meaning of "privilege with respect to such security" within § 20(d). The Court, therefore, must determine, on the basis of the factual record before it, whether the SARs and PSARs here involved are such "privileges" and now does so, finding that privileges are rights which can and do affect the actual purchase or sale of a security[26] at the will of the holder and that the particular SARs and PSARs at issue in this case are not "privilege[s] with respect to" Riverwood stock within the meaning of § 20(d).

The Riverwood 1992 Long Term Incentive Plan provides for several types of stock-based awards in addition to the stock appreciation rights awards; sets aside a specific number of shares with respect to which awards may be granted; specifically states that "no Participant or holder or beneficiary of any Award shall have any rights as a stockholder with respect to any Shares to be distributed under the Plan until he or she has become the holder of such Shares"; and states that "no Award granted [under the Plan] shall be construed as an offer to sell securities". Upon exercise of the SARs awarded under the 1992 Plan the value of the SARs was payable in cash or Riverwood stock, at the option of the company. The Stock Appreciation Rights Agreements specified the grant price of each SAR awarded; that the SARS were payable in cash or stock, at the option of the company; that the recipient did not "have any rights as a stockholder with respect to any Shares related to the SARs prior to payment by the Company in the form of Shares"; and that the SARs were not offers to sell Riverwood securities.

The 1994 Long Term Incentive Plan provides only for awards of Premium Stock Appreciation Rights; specifies a maximum number of shares with respect to which PSARS may be awarded; states that payments made upon the exercise of the PSARs "shall be made in cash in a single payment"; and specifically states that "[n]o Participant or holder or beneficiary of any Award shall have any rights as a stockholder with respect to any Premium Stock Appreciation Rights under the Plan." The PSAR Agreements specified the number of PSARs being awarded and the per share grant price of each PSAR; that the PSARs were payable in cash; and that the recipient had no rights as a stockholder with respect to any PSARs granted.

Although the value of SARs and PSARs varied directly with the value of Riverwood stock, they did not provide the holders of the SARS and PSARs with any rights relating to any stock. Further, exercise of the SARs and PSARs did not affect the legal or beneficial ownership of any stock or the right to

26. Because there was no contemporaneous trade in the SARs and PSARs involved here, the Court finds immaterial the issue of whether or not the SARs and PSARs were derivative securities.

own, purchase, or sell any stock. Finally, and the Court believes this to be most important, there was no market on which the SARs or PSARs could be traded. The SARs and PSARs at issue here were not privileges with respect to securities within the meaning of § 20(d).

Even if the individual defendants' access to information was superior to Clay's, and on the record it seems quite likely that it was for at least some of the individual defendants, there is no transactional nexus[27] between Defendants' exercise of their SARs and PSARs and Clay's stock purchases. While Clay's purchases may have been instrumental in increasing the actual payout value of the SARs and PSARs, Clay suffered no disadvantage (such as by paying a higher price for his stock) in purchasing the Riverwood common stock because of Defendants' superior access to information. The demand/supply curve of Riverwood common stock at the time Clay made his September 21 purchases was not affected in the least (even in the theoretical sense contemplated by the phrase "fraud on the market") by Defendants' actions with respect to their SARs and PSARs. The only disadvantage, if any, accruing from such exercise was to Riverwood itself, whose treasury was depleted by the entire payment for each right exercised, and to existing stockholders, each of whom lost a little bit of that which he had previously owned. This case does not involve a stockholder's derivative claim.[28]

The pegging of the SARs and PSARs to market price was simply a device, common to many corporations, to attempt to adjust an executive's compensation to his value to the corporation. An executive's efforts at increasing the value of the corporation's stock receives the utmost appreciation from stockholders. As far as its effect upon the stock market, the exercise value of the SARs and PSARs could have been pegged to the Dow Jones index, except that would not have correlated as well to the quality sought to be measured.

## IV. Dissemination of False or Misleading Information

### A. Riverwood Press Releases

In his Second Amended Complaint, Clay alleges Riverwood's October 19 press release to the effect that it was reviewing strategic alternatives, one of which was the possible sale or merger of Riverwood, was misleading at the time it was made and that earlier press releases became misleading during the relevant time period because Defendants knew that acquisition by Georgia Pacific and International Paper were no longer being considered and that the only viable alternative at the time was a leveraged buyout. In response to the motion for summary judgment, however, Clay argues only that the July 20 press release became misleading during the relevant time period.

"Section 10(b) was designed as a catchall clause to prevent fraudulent practices."[29]

**27.** In securities cases, the "nexus" is, at least usually, the securities market(s) itself. *Basic, Inc.*, 485 U.S. at 244, 108 S.Ct. at 990 (*quoting In re LTV Securities Litigation*, 88 F.R.D. 134, 143 (N.D.Tex.1980)) ("[T]he market is interposed between seller and buyer and ... is performing a substantial part of the valuation process performed by the investor in a face-to-face transaction.... The market is acting as the unpaid agent of the investor."). Generally a buyer never knows whose stock he buys, or the seller, who buys the stock he sells. Out of this impersonal, mass market context has evolved the concepts of "fraud on the market" and "transactional nexus." *Id.* at 243–44, 108 S.Ct. at 989–90 (*quoting Peil v. Speiser*, 806 F.2d 1154, 1160–61 (3rd Cir.1986)) ("The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its

business."); *Chiarella*, 445 U.S. at 230, 100 S.Ct. at 1115–16 ("[L]iability [for insider trading] is premised upon a duty to disclose arising from a relationship of trust and confidence between parties to a transaction.")

**28.** To the extent the exercises of the SARs and PSARs may have provided some of the capital with which the consortium was able to make its bid, their exercise may have been beneficial to the company's stockholders.

**29.** Section 10(b) states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities ex-

*Chiarella v. United States,* 445 U.S. 222, 226, 100 S.Ct. 1108, 1113, 63 L.Ed.2d 348 (1980). To state a cause of action under § 10(b) and Rule 10b–5, a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury. *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Inc.,* 75 F.3d 801, 808 (2nd Cir.1996) (citing *In re Time Warner Inc. Securities Litigation,* 9 F.3d 259, 264 (2nd Cir.1993), *cert. denied,* 511 U.S. 1017, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994)). "When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." *Chiarella,* 445 U.S. at 235, 100 S.Ct. at 1118. "A duty to disclose may ... be created by a defendant's previous decision to speak voluntarily. Where a defendant's failure to speak would render the defendant's *own* prior speech misleading or deceptive, a duty to disclose arises." *Rudolph v. Arthur Andersen & Co.,* 800 F.2d 1040, 1043 (11th Cir.1986)(emphasis in original), *cert. denied,* 480 U.S. 946, 107 S.Ct. 1604, 94 L.Ed.2d 790 (1987). Undisclosed information is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *Time Warner,* 9 F.3d at 267–68 (quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

Clay argues that the following press release issued by Riverwood on July 20, 1995, later became false or misleading:

As announced earlier, Riverwood has begun a review of strategic alternatives which may be available to it and in the best interest of all Riverwood shareholders. One alternative is the possible sale or merger of Riverwood. J.P. Morgan & Co. and Goldman Sachs & Co. are contacting a selective set of potential buyers and working closely with the Riverwood management to evaluate this alternative.

Specifically, Clay suggests that the final sentence, that J.P. Morgan and Goldman Sachs were contacting a selective set of potential buyers and that they were working closely with the Riverwood management to evaluate the alternative, made the press release misleading when the bidding process produced no acceptable bids.

Assuming, *arguendo,* the consortium, consisting in part of Riverwood management, was the only potential purchaser during the relevant time period, Riverwood's press release, taken in its totality, was never false and never became false or misleading. Even if J.P. Morgan and Goldman Sachs were no longer working with Riverwood management to evaluate the "selective set of potential buyers," the press release did not suggest that only entities which were part of the "selective set of potential buyers" would be considered as purchasers of or partners for Riverwood. The terms of the release were plain that Riverwood was receptive to all offers; it was merely affirmatively approaching some entities most likely to make offers. Nor did the press release provide information about the "selective set of potential buyers" to distinguish them from any other potential buyers. Further, the press release indicated that a sale or merger was only one of several strategic alternative being considered. Thus the "total mix" of information provided by Riverwood and available to the

change or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
15 U.S.C. § 78j(b).
Rule 10b–5, promulgated pursuant to § 10(b), more specifically states:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b–5.

public neither eliminated nor discounted the possibility of a leveraged buyout by a consortium consisting in part of Riverwood management.

In *Time Warner*, the Second Circuit addressed arguments similar to those presented here. *In re Time Warner Inc. Securities Litigation*, 9 F.3d 259 (2nd Cir.1993), *cert. denied*, 511 U.S. 1017, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994). While Time Warner was looking at methods for raising capital, various reports appeared in the financial press, some attributed directly to Time Warner and others attributed to unidentified persons. The articles suggested that Time Warner was looking for international "strategic partners" to provide money and help Time Warner become a worldwide entertainment conglomerate. *Id.* at 262. Unable to find the strategic partners it desired, Time Warner resolved its need for capital by issuing a new stock offering which diluted the rights of existing shareholders. *Id.* Plaintiffs, persons who purchased Time Warner stock during a specific time period, argued that the articles "were materially misleading in that they misrepresented the status of the ongoing strategic partnership discussions and failed to disclose consideration of the stock offering alternative." *Id.* The court separately addressed the anonymous statements and the attributed statements finding: (1) the complaint as to the anonymous statements failed to allege fraud specifically enough to satisfy Fed.R.Civ.P. 9(b), *id.* at 264–65; (2) none of the attributed statements constituted an affirmative misrepresentation, id. at 266; (3) the attributed statements describing the search for strategic partners did not become misleading despite their failure to disclose problems in the negotiations, *id.* at 267; but (4) failure of the attributed statements to disclose consideration of alternative methods of raising capital were materially misleading, *id.* at 267–68.

In this case, as in *Time Warner*, the Riverwood press releases describing the search for potential buyers lacked "the sort of definite positive projections that might require later correction." *Id.*, 9 F.3d at 267. In contrast to *Time Warner*, however, where there was a wide divergence between what was announced and what actually occurred, the actual outcome in this case, a leveraged buyout by a consortium consisting in part of Riverwood management including the individual defendants, clearly fell within the alternatives Riverwood publicly stated it was considering. The very use of the term "alternatives" in the press release in question, quite possibly prompted by the *Time Warner* decision, clearly indicated that Riverwood was not confining its options. The fact that a sale of the company was involved was not altered by calling the transaction a "buyout." Every sale involves a "buyout" to some extent. Every sale also could be called a "sellout." Nor is the adjective "leveraged" a pejorative term.

The Court finds the press releases did not become materially misleading either because Georgia Pacific and International Paper did not make acceptable bids or because Riverwood was eventually sold to the consortium in a so-called "leveraged buyout." There is no suggestion that the bid price was not in fact an appropriate one. Indeed, by alleging Defendants knew the $25.25 price upon which they exercised their SARs and PSARs was inflated, Clay seemingly indicates that the price paid by the consortium was appropriate. It is clear Clay would have been perfectly happy if the leveraged buyout had been at the $30.00 level for which he was apparently hoping. The price compared to what he paid, not the nature of the transaction, was what was important to Clay.

B. *Anonymous Statements in the Financial Press*

In his Second Amended Complaint, Clay alleges certain articles or announcements in the financial press were "controlled by and/or approved by" Riverwood or Manville and were false or misleading at the time they were made or became so during the relevant time period. He alleges members of Riverwood's management team met regularly with securities analysts and financial reporters to discuss "among other things, the Company's prospects, operating results, anticipated earnings, prospects of sale or merger and to give detailed guidance to these analysts with respect to these topics"

and "used their communications with such analysts to falsely present the prospects of the merger and acquisition," but Clay provides neither times nor places for any of these alleged meetings. Nor does he allege which members of Riverwood management were present at the meetings. Clay specifically refers to reports in Bloomberg on May 9 and July 19, 1995; an August 16, 1995, article in the Wall Street Journal; an October 20, 1995, report from Reuters; and articles in the Atlanta Constitution on October 23 and 24, 1995, but affords no indication, even after extensive discovery, why one should believe they emanated from Defendants.

Defendants argue that this claim must be dismissed pursuant to Fed.R.Civ.P. 9(b).[30]

In response to the motion for summary judgment, Clay alleges generally that "Defendants and/or Manville released information to the press and/or confirmed information to the press," but argues only that he should be given the opportunity to pursue additional discovery to determine the actual sources of the articles of which he complains.

■ "Federal Rule of Civil Procedure 9(b) requires that fraud be pleaded with specificity. The plaintiff's complaint must allege the details of the defendants allegedly fraudulent acts, when they occurred, and who engaged in them." *Cooper v. Blue Cross and Blue Shield of Florida,* 19 F.3d 562, 568 (11th

Cir.1994). General, conclusory allegations are not sufficient. *Id.*

■ None of the articles of which Clay complains attributes any comment to Riverwood or to any of the individual defendants.[31] Three of the four articles, in fact, suggest that Riverwood was not the source of the information, and the fourth, written by the same commentator who earlier had confirmed Riverwood's policy of declining to comment and suggesting no change in that policy, appears to be restating information provided in the earlier article. Clay has not pleaded fraud based upon unattributed comments in the financial press with particularity. Further, the record[32] and Clay's proffer fail to support his claim. While this claim perhaps should have been dismissed earlier with prejudice pursuant to Fed.R.Civ.P. 9(b), *Time Warner,* 9 F.3d at 266, the Court believes it preferable, considering that the present development of the record is adequate to permit far greater specificity by Clay, to grant summary judgment thereon for Defendants pursuant to Fed.R.Civ.P. 56.

## CONCLUSION

The thrust of the laws and regulations invoked by Clay is to protect the integrity of securities markets (with participants on both sides) where prices (which are governed by supply and demand) have been unfairly affected, up or down, by insider trader activity including a disparity in knowledge of materi-

---

**30.** Rule 9(b) states:

> **Fraud, Mistake, Condition of the Mind.** In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.
> Fed.R.Civ.P. 9(b).

**31.** The May 9 article from Bloomberg attributes information to "people involved in the negotiations" between Georgia Pacific and Manville and to "a Manville executive." Additionally, the article states: "Officials at both Georgia–Pacific and Riverwood declined to comment as a matter of policy."

The July 19 article from Bloomberg extensively quotes "Georgia–Pacific's Pete Correll" but attributes to "[e]xecutives close to the two Atlanta-based companies" the information that "Georgia–Pacific plans to bid $1.34 billion, or $25 a share, for Manville Corp.'s controlling stake in Riverwood."

The August 16 Wall Street Journal article attributed information about the bidding process for Riverwood to "individuals familiar with the process." Information that Riverwood could sell for as much as $30 a share was attributed to "[a]nalysts who follow the company." The article added that "Manville and Riverwood declined to comment."

The October 20 report from Reuters discussing the status of the Riverwood bidding process indicated that "Wall Street believes prospective bidders are backing away" but stated that "[a] Riverwood spokeswoman declined to comment about its progress in assessing its strategic direction." The report further indicated that "Riverwood has been tight-lipped with the financial community about any potential buyers."

**32.** Both Johnson and Burg in their depositions deny that they or any Riverwood spokesperson provided or confirmed any information contained in the allegedly misleading articles.

al information. There is no indication that such happened here. While tying the exercise value of the SARs and PSARs to the price of Riverwood stock gave Defendants the opportunity to profit at the expense of the company's treasury, arguably based upon their insider knowledge, their actions had no effect on the price of the stock bought by Clay, and, of course, the corporation and its stockholders are the ones best equipped to judge whether Defendants' service to the corporation justified such remuneration or whether the measure thereof was appropriate.

Having found that all information necessary to resolve the issues of whether there was a transactional nexus between the individual defendants' exercise of their SARs and PSARs and Clay's purchase of Riverwood stock, of whether Riverwood's press releases were or became misleading, and of whether Defendants either provided or confirmed unattributed information contained in news articles is before the Court, the Court DENIES Clay's motion for additional discovery. Having found that Clay has no standing to bring the insider trading claim pursuant to § 20A and that the Riverwood press releases were not false or misleading when made and did not become false or misleading, the Court GRANTS Defendants' motion for summary judgment. The Court DENIES as moot all other motions.

CLERK OF COURT is directed to enter judgment in favor of Defendants. This closes the case.

SO ORDERED.