United States Court of Appeals,

Eleventh Circuit.

No. 97-8592.

Forrest Kelly CLAY, individually and on behalf of all those similarly situated, Plaintiff-Appellant,

v.

RIVERWOOD INTERNATIONAL CORPORATION, Thomas H. Johnson, et al., Defendants-Appellees.

Oct. 14, 1998.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:95-CV-3147-CAM), Charles A. Moye, Jr., Judge.

Before HATCHETT, Chief Judge, and DUBINA and CARNES, Circuit Judges.

HATCHETT, Chief Judge:

In this appeal, we address an issue of first impression in the circuits: whether corporate insiders' exercise of stock appreciation rights for cash from their employing company implicates the insider trading laws of §§ 10(b), 20(d) and 20A(a) of the Securities Exchange Act of 1934, as amended (Exchange Act), 15 U.S.C. §§ 78j(b), 78t(d) and 78t-1(a) (1994), and Securities and Exchange Commission (SEC) Rule 10b-5, 17 C.F.R. § 240.10b-5 (1997). We also discuss whether events, namely serious negotiations with a leveraged buyer, that occurred subsequent to a company's press release concerning its "possible sale or merger" and "a selective set of potential buyers" triggered a duty to disclose under the securities fraud provisions of § 10(b) and rule 10b-5. We answer both issues in the negative, affirming the judgment of the district court.

I. BACKGROUND

Prior to 1995, appellee Riverwood International Corporation (Riverwood), a packaging, paperboard and packaging machinery company, granted to its president, appellee Thomas Johnson,

and three senior vice-presidents, appellees Robert Hart, Robert Burg and Frank McCauley (collectively Riverwood officers), a specified number of stock appreciation rights (SARs) as part of senior management benefits. Under the terms of the SARs agreement, Riverwood officers would receive payment from the company equal to the difference between the SARs' grant value and the fair market value of Riverwood's stock at the time they exercised them.[1] At its discretion, Riverwood could pay the exercising officer in cash or stock.[2] The agreement further provided that the SARs (1) did not contain any stockholder rights; (2) were not options or offers to sell stock; and (3) could not be sold, assigned, or otherwise transferred. Riverwood secured the SARs with a pool of stock.

In early 1995, Riverwood's 81 percent stockholder, Manville Corporation, found itself in need of cash to settle asbestos litigation claims. A committee that the boards of directors of Riverwood and Manville formed met to consider alternatives, ranging from maintaining the status quo, to merging with another company, to selling Manville's share of Riverwood or Riverwood in its entirety. Eventually, the committee retained financial advisors, J.P. Morgan & Co., Inc., and Goldman Sachs & Co., to solicit buyers.

In June 1995, three potential buyers emerged: Georgia Pacific Corporation, International Paper Company and a Brazilian consortium, Clayton, Dubilier & Rice (CD&R). Preliminarily, Georgia Pacific and International Paper contemplated a cash deal, ranging from $20 to $26 per

---

[1]The SARs' grant values ranged from $13.77 to $26.

[2]Some of the SARs—"premium" SARs—limited the exercise to cash, not stock. Because Riverwood, in its discretion, chose to pay cash for all the SARs at issue, however, the distinction between premium and non-premium SARs is inconsequential.

share.  CD&R, on the other hand, expressed interest in a leveraged (or financed) buyout, ranging from $24 to $25.50 per share, with $21 being in cash.

On July 20, 1995, in conjunction with its second quarter financial results, Riverwood issued a press release:

> As announced earlier, Riverwood has begun a review of strategic alternatives which may be available to it and in the best interest of all Riverwood shareholders.  One alternative is the possible sale or merger of Riverwood.  J.P. Morgan & Co. and Goldman Sachs & Co. are contacting a selective set of potential buyers and working closely with Riverwood management to evaluate this alternative.

An informal, non-binding bidding process ensued.  At the end of August 1995, Riverwood received only one bid:  Georgia Pacific's proposed cash deal of $20 per share.  Although it did not submit a bid, CD&R regrouped and asked Riverwood officers (and other senior management) to finance part of a buyout to ensure that they would remain with the company.  Ultimately, after additional negotiations, the committee rejected Georgia Pacific's proposal and pursued CD&R.

Meanwhile, throughout September 1995, appellant Forrest Clay purchased 36,400 shares of Riverwood stock, paying between $23 to $26 per share.  On September 21, 1995, when the value of the stock registered at $25.25 per share, Riverwood officers exercised many of their SARs, collectively receiving over $7,000,000 in cash.  Riverwood paid them directly out of its treasury.  It did not buy, sell or issue any stock to raise the necessary capital.

On October 25, 1995, Riverwood's Board of Directors approved CD&R's proposed leveraged buyout at $20.25 per share.  The next day, Riverwood announced the deal to the public.  After stockholders approved the buyout, CD&R redeemed Clay's shares.

3

In December 1995, Clay sued Riverwood and its officers in the United States District Court for the Northern District of Georgia.[3] In his second amended complaint, Clay alleged that: (1) Riverwood officers engaged in insider trading, in violation of §§ 10(b) and 20A(a) of the Exchange Act and rule 10b-5, when they exercised the SARs acting upon material, non-public information about CD&R's proposed leveraged buyout at an amount per share less than current market value; and (2) Riverwood and its officers engaged in fraud in connection with the purchase or sale of securities, in violation of § 10(b) and rule 10b-5, in failing to update its July 20, 1995 press release before it became false and misleading in light of new circumstances, namely the rejection of Georgia Pacific's cash offer and the pursuit of CD&R's leveraged buyout proposal.

The district court granted Riverwood and its officers' motion for summary judgment on both claims. *See Clay v. Riverwood Int'l Corp.,* 964 F.Supp. 1559 (N.D.Ga.1997). Regarding insider trading, the district court concluded that: (1) Clay lacked statutory standing under § 20A(a) because no transactional nexus existed between his purchase of stock and Riverwood officers' exercise of the SARs; and (2) the SARs were not "privileges with respect to" securities under § 20(d). *See* 964 F.Supp. at 1570-72. As to Clay's securities fraud claim, it found that the press release "did not become materially misleading either because Georgia Pacific and International Paper did not make acceptable bids or because Riverwood was eventually sold to the consortium in a so-called 'leveraged buyout.' " 964 F.Supp. at 1574.

## II. ISSUES

---

[3]Clay sought to maintain the lawsuit as a class action, but the district court entered judgment against him prior to deciding whether to certify the proposed class.

We discuss whether the district court erred in granting Riverwood and its officers' motion for summary judgment on Clay's claims of (1) insider trading and (2) securities fraud. Our standard of review is *de novo*. *See S.E.C. v. Adler,* 137 F.3d 1325, 1332 (11th Cir.1998) ("A district court's grant of summary judgment is reviewed *de novo,* applying the same standards utilized by the district court."). A district court properly enters summary judgment if the record evidence before it "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

## III. DISCUSSION

## A. Insider Trading

"Under the "traditional' or "classical theory' of insider trading liability, § 10(b) and Rule 10b-5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information." *United States v. O'Hagan,* --- U.S. ----, ----, 117 S.Ct. 2199, 2207, 138 L.Ed.2d 724 (1997).[4] Section 20A(a) of the Exchange Act essentially codified this

---

[4]Section 10(b) of the Exchange Act provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> ....
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

judicially-created law, clarifying that certain private plaintiffs have a cause of action against corporate insiders who "purchas[e] or sell[ ] a security while in the possession of material, nonpublic information[.]" 15 U.S.C. § 78t-1(a); *see generally Halkin v. VeriFone, Inc. (In re VeriFone Securities Litigation),* 11 F.3d 865, 871 (9th Cir.1993) ("[I]n light of our conclusion that no violation of [§ 10(b) ] has been stated, the § 20A claim was properly dismissed.").[5] The insider's "purchase

---

The SEC, in turn, promulgated rule 10b-5, which reads:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. These sources birthed not only the "traditional" but also the "misappropriation" theory of insider trading, which "holds that a person commits fraud "in connection with' a securities transaction, and thereby violates § 10(b) and Rule 10b-5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." *O'Hagan,* --- U.S. at ----, 117 S.Ct. at 2207. Because Clay did not premise his claim on the misappropriation theory, our discussion does not concern it.

[5]Section 20A(a) of the Exchange Act reads:

> (a) Private rights of action based on contemporaneous trading
>
> Any person who violates any provision of [the Exchange Act] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the

6

or sale of a put, call, straddle, option, or privilege with respect to" a security under similar circumstances also triggers these insider trading laws. 15 U.S.C. § 78t(d) (§ 20(d)); *see also* 15 U.S.C. § 78c(a)(10) (defining "security" to include "any put, call, straddle, option, or privilege on any security").[6]

Clay alleges that Riverwood officers violated the "disclose or abstain" rule of insider trading when they exercised the SARs with knowledge of Georgia Pacific's rejected cash offer and CD&R's promising leverage buyout that, if accepted, would cause the value of a share to drop substantially less than current market value. *See Adler,* 137 F.3d at 1333 (reciting the "familiar maxim" that "a

---

subjection of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

15 U.S.C. § 78t-1(a). To have statutory standing under § 20A(a), private plaintiffs must have "purchased ... or sold ... securities of the same class" "contemporaneously" with the insider transaction at issue. 15 U.S.C. § 78t-1(a). Because we conclude that the SARs did not constitute instruments that trigger insider trading laws, we need not reach the district court's conclusion that Clay lacked statutory standing. *See Whitaker v. Frito-Lay, Inc. (*In re *Olympia Holding Corp.),* 88 F.3d 952, 959 n. 13 (11th Cir.1996).

[6]Section 20(d) of the Exchange Act provides:

(d) Liability for trading in securities while in possession of material nonpublic information

Wherever communicating, or purchasing or selling a security while in possession of, material nonpublic information would violate, or result in liability to any purchaser or seller of the security under any provision of [the Exchange Act], or any rule or regulation thereunder, such conduct in connection with a purchase or sale of a put, call, straddle, option, or privilege with respect to such security or with respect to a group or index of securities including such security, shall also violate and result in comparable liability to any purchaser or seller of that security under such provision, rule, or regulation.

15 U.S.C. § 78t(d).

7

corporate insider has a duty to disclose material nonpublic information or to abstain from trading on the information"). We can assume, for purposes of discussion only, that this information was material and nonpublic and that Riverwood officers not only possessed but also used it when exercising the SARs. *See Adler,* 137 F.3d at 1337 (to breach the "disclose or abstain" rule, insiders must use—not merely possess—material, nonpublic information while trading). Thus, the viability of Clay's claim and this appeal hinges upon a narrow question: whether the SARs constituted "securities[,]" "put[s], call[s], straddle[s], option[s] or privilege[s] with respect to" securities. 15 U.S.C. § 78t-1(a), 78t(d); *see generally Blackston v. Shook & Fletcher Insulation Co.,* 764 F.2d 1480, 1481 (11th Cir.1985) (appellate courts best serve the law in deciding "each case on the narrow ground that leads to a decision"); *Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 91 (5th Cir.1975) ("A preliminary task in every 10b-5 case is to find some "security' that was the object of the activities in question."). Upon careful review of the Exchange Act, case law, SEC regulations, legislative history, and the policy behind insider trading laws, we hold that the SARs did not fit into any of these categories of instruments.

No dispute exists that the instruments were, in fact, SARs.[7] In a case involving misrepresentation, as opposed to insider trading, under § 10(b) and rule 10b-5, the Seventh Circuit explained that typically "SARs are issued to senior ... officers as part of their compensation. They ... entitle the holder to a cash or stock payment in an amount representing the difference between the market value and the strike [or grant] price specified on the face of the SAR." *Searls v. Glasser,* 64

---

[7]Similarly, no genuine issues of fact exist concerning the terms, nature and scope of the instruments at issue.

F.3d 1061, 1064-65 (7th Cir.1995).[8]  The instruments in this case essentially fit this description,

except that Riverwood permitted its officers to exercise the SARs only for cash, not stock.

Although these cash-only instruments were undoubtedly SARs, they were not "securities."

15 U.S.C. § 78t-1(a).  The Exchange Act broadly defines a "security," and noticeably absent from

this provision is any reference to SARs or other cash-only instruments.  *See* 15 U.S.C. § 78c(a)(10);

*Landreth Timber Co. v. Landreth,* 471 U.S. 681, 686, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985)

(describing as "broad" the virtually-identical definition of a security in 15 U.S.C. § 77b(1)).[9]  The

---

[8]*See also Seinfeld v. Hospital Corp. of America,* 685 F.Supp. 1057, 1065 n. 9 (N.D.Ill.1988)
("Stock appreciation rights involve the right to receive the appreciation on a specified number of
shares of the company's securities (generally common stock) which occurs within a specified
time period.") (internal quotation marks and citation omitted);  *Colema Realty Corp. v. Bibow,*
555 F.Supp. 1030, 1038 (D.Conn.1983) ("Stock appreciation rights give the optionee the right to
receive, either in cash or stock, the increase in the value of the optioned shares from the date of
the grant of the option to the date of the exercise of such rights.");  *Portnoy v. Seligman & Latz,
Inc.,* 516 F.Supp. 1188, 1197 (S.D.N.Y.1981) ("Stock appreciation rights are a form of executive
compensation which allow the holder, upon their exercise, to receive either cash or securities
representing the spread between a fixed stock price and the prevailing market price.").

[9]In full, the Exchange Act defines a security to include

> any note, stock, treasury stock, bond, debenture, certificate of interest or
> participation in any profit-sharing agreement or in any oil, gas, or other
> mineral royalty or lease, any collateral-trust certificate, preorganization
> certificate or subscription, transferable share, investment contract,
> voting-trust certificate, certificate of deposit, for a security, any put, call,
> straddle, option, or privilege on any security, certificate of deposit, or
> group or index of securities (including any interest therein or based on the
> value thereof), or any put, call, straddle, option, or privilege entered into
> on a national securities exchange relating to foreign currency, or in
> general, any instrument commonly known as a "security";  or any
> certificate of interest or participation in, temporary or interim certificate
> for, receipt for, or warrant or right to subscribe to or purchase, any of the
> foregoing;  but shall not include currency or any note, draft, bill of
> exchange, or banker's acceptance which has a maturity at the time of
> issuance of not exceeding nine months, exclusive of days of grace, or any
> renewal thereof the maturity of which is likewise limited.

lack of published case law holding that SARs are securities under § 10(b) and/or 20A(a), therefore, comes as no surprise.[10] Clay neither points to, nor can we find, any contrary excerpts from the legislative history of the Exchange Act or its 1988 amendment that added § 20A(a). *See generally* H.R.Rep. No. 910, 100th Cong., 2d Sess. (1988), *reprinted in* 1988 U.S.C.C.A.N. 6043 ("Although the courts have recognized an implied private right of action in insider trading cases, [§ 20A(a) ] would codify an express right of action against insider traders and tippers for those who traded in the same class of *securities* "contemporaneously' with and on the opposite side of the market from the insider trader.") (emphasis added).[11] The SEC does include "stock appreciation rights" in its regulatory construction of "derivative securities," but it applies "solely to section 16 of the

15 U.S.C. § 78c(a)(10). Clay does not suggest, nor do we find, that the SARs fit into the catch-all portion of this definition, that is, "instrument[s] commonly known as a "security'[.]" 15 U.S.C. § 78c(a)(10). Nor does Clay argue, and rightly so, that the SARs served as "investments." *See Reves v. Ernst & Young*, 494 U.S. 56, 61, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990) ("Congress' purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called."). He does, however, summarily contend that the SARs offered Riverwood officers "participation in" stock. 15 U.S.C. § 78c(a)(10). The terms of the agreement accompanying the SARs belie that position, for it expressly stated that holders possessed no rights associated with stock (*e.g.,* the right to vote, to receive dividends, or to submit proposals in a proxy statement).

[10]In entering judgment against a stockholder who brought a derivative action alleging that corporate officers exercised SARs in violation of § 16(b)'s proscription on "short-swing" profits, a district court opined that "Congress has left some of the problems of the abuse of inside information to other remedies. Sanctions such as those imposed by Rule 10b-5 alleviate concern that ordinary investors will not be protected against actual abuses of inside information by officers and directors who are granted stock options and *stock appreciation rights*." *Freedman v. Barrow,* 427 F.Supp. 1129, 1153 n. 15 (S.D.N.Y.1976) (emphasis added). This *obiter dictum,* however, does not persuade us—at least where, as here, the holder exchanges SARs for cash instead of stock.

[11]Congress added § 20A(a) to the Exchange Act pursuant to § 5 of the Insider Trading and Securities Fraud Enforcement Act, Pub.L. No. 100-704, 102 Stat. 4677.

[Exchange Act] and the rules thereunder." 17 C.F.R. § 240.16a-1(c).[12] Indeed, "derivative security" does not appear—either directly or through incorporation—in any of the provisions at issue in this case. *See* 15 U.S.C. §§ 78c(a)(10), 78j(b), 78t(d) and 78t-1(a); 17 C.F.R. § 240.10b-5. As such, although corporate insiders may be strictly liable for "short-swing" profits gained from exercising SARs within a six-month period, the SEC has not taken any similar steps to broaden the reach of the insider trading laws at issue. *See Magma Power Co. v. Dow Chemical Co.,* 136 F.3d 316, 320 (2nd Cir.1998) ("Section 16(b) ... compels statutory insiders to disgorge profits earned on any purchase and sale (or sale and purchase) made within six months of each other."); *see, e.g., Matas v. Siess,* 467 F.Supp. 217, 227 (S.D.N.Y.1979) (plaintiff stated a cause of action under § 16(b) against corporate officers and directors "arising from their purchases and sales of securities within a six-month period through exercise of their *stock appreciation rights* for cash at their own election") (emphasis added). The SEC release that Clay cites adds nothing to the analysis; if anything, it recognizes the purely intra-company nature of many SARs. *See* Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 34-37260 (May 31, 1996) (including "cash-only instrument[s] whose value is derived from the market value of an issuer equity security" in the definition of "derivative securities" for purposes of § 16 and its rules and regulations because the "opportunity to profit based on price movement in the underlying stock" is equivalent to that of "other issuer equity securities"; noting, however, that although most "transactions in cash-only instruments [are] reportable[,]" such instruments "should usually qualify[

---

[12]Rule 16a-1(c) states, in pertinent part, that "[t]he term *derivative securities* shall mean any option, warrant, convertible security, *stock appreciation right,* or similar right with an exercise or conversion privilege at a price related to an equity security, or similar securities with a value derived from the value of an equity security[.]" 17 C.F.R. § 240.16a-1(c) (emphasis added).

11

] for exemption" from § 16(b)'s proscription on "short-swing" profits because "cash-only instruments generally are not traded in market transactions").[13]

Just as the SARs were not securities, they were not "put[s], call[s], straddle[s][or] option[s.]" 15 U.S.C. § 78t(d). Puts involve the right to sell stock. *See Kirchman v. Commissioner,* 862 F.2d 1486, 1488 n. 3 (11th Cir.1989). Calls, on the other hand, represent the right to buy stock. *See Kirchman,* 862 F.2d at 1488. Straddles implicate both puts and calls; they "involve[ ] the purchase or sale of an equal number of puts and calls on the same stock[.]" Eric D. Roiter, *Developments in the Financial Futures and Options Market,* 539 Practising Law Institute, Corporate Law & Practice Course Handbook Series 169, 201 (1986); *see also Kirchman,* 862 F.2d at 1488. Essentially, these three instruments are all types of options, often referred to as "stock options." Norman S. Poser, *Options Accounts Fraud: Securities Churning in a New Context,* 39 Bus. Lawyer 571, 586 (1984) ("A stock option is a right to buy or sell a particular stock at a certain price for a limited period of time.").

Plainly, nothing in the text of §§ 10(b), 20A(a) or 20(d) or rule 10b-5 purports to equate SARs with stock options. *Accord* 15 U.S.C. § 78i(b)-(d) (other provisions involving a "put, call, straddle, option, or privilege in relation to any security"). The same is true of the relevant legislative history. *See generally* H.R.Rep. No. 355, 98th Cong., 1st Sess. (1983), *reprinted in* 1984 U.S.C.C.A.N. 2274 (recognizing the "growth of the *options* market" and citing an example of an

---

[13]Along these lines, we note that Riverwood officers reported their exercises on the SEC's "Form 4," or "Statement of Changes in Beneficial Ownership," pursuant to § 16(a) of the Exchange Act. Specifically, they listed the SARs in the column entitled "Table II—Derivative Securities Acquired, Disposed of, or Beneficially Owned (*e.g.,* puts, calls, warrants, options, convertible securities)." Clay urges us to find significance in this event, contending that the officers themselves believed that the law treated SARs as securities. At best, however, their conduct evinces an abundance of caution, not an admission.

insider's profiting $427,000 from the purchase of "*call options* of a corporation which was to be the subject of a takeover proposal") (emphasis added).[14] The only authority that Clay points to is the Seventh Circuit's observation that SARs are "not unlike options[.]" *Searls,* 64 F.3d at 1065. The *Searls* court, however, engaged in that analogy only for the illustrative "purposes of [that] opinion[.]" *Searls,* 64 F.3d at 1065. Importantly, all stock options when exercised involve a market transaction—even if it takes a split-second for holders to sell on the market the stock that they received in order to capture the difference between the grant and market values. Holders of SARs like the ones in this case, in material contrast, receive cash directly out the issuer-company's treasury. They do not sell stock at any time.[15]

Finally, the SARs were not "privileges with respect to" securities. 15 U.S.C. § 78t(d). Section 20(d) of the Exchange Act speaks of "privileges" immediately after puts, calls, straddles and options. *See* 15 U.S.C. § 78t(d) (prohibiting the "purchasing or selling ... of a put, call, option, or *privilege with respect to* " a security "while in possession of material, nonpublic information" to the same extent that the Exchange Act and its regulations prohibit such conduct with regard to a security) (emphasis added). Under the statutory construction doctrine *noscitur a sociis,* "a word is known by the company it keeps[.]" *Gustafson v. Alloyd Co.,* 513 U.S. 561, 575, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). As we previously established, puts, calls, straddles and options share a material

---

[14]Congress added § 20(d) to the Exchange Act pursuant to the Insider Trading Sanctions Act of 1984, Pub.L. No. 98-376, 98 Stat. 1264. In its order, the district court quoted from a law review article that surveyed other legislative history surrounding § 20(d), which Senate "added late" in the process. *See Clay,* 964 F.Supp. at 1569. As is readily apparent, Congress focused on options, not SARs.

[15]We also note that to pay the exercising officers, Riverwood did not have to sell any of the stock that it had apparently "set-aside" to secure payment.

commonality: an underlying stock transaction. Unlike the exercise of puts, calls, straddles or options, the "exercise of the SARs ... did not affect the legal or beneficial ownership of any stock or the right to own, purchase, or sell any stock." *Clay,* 964 F.Supp. at 1571-72. Furthermore, puts, calls, straddles and options themselves are traded on markets. *E.g., Moskowitz v. Lopp,* 128 F.R.D. 624, 631 (E.D.Pa.1989) ("[T]raders in puts and calls rely on the integrity of information disseminated in the *market* just as do purchasers and sellers of the underlying security.") (citation omitted and emphasis added). The SARs, conversely, were not, and could not be, traded—either in the abstract or through bartering. *Clay,* 964 F.Supp. at 1572 (rejecting Clay's contention that the SARs were "privileges with respect to" securities primarily because "there was no market on which the SARs ... could be traded"). In fact, the SARs agreement expressly stated that the instruments were non-transferable. Therefore, in light of the significant distinctions between stock options (that is, puts, calls, straddles or options) and the SARs, our adopting Clay's interpretation of "privileges with respect to" securities would yield precisely the "unintended breadth" that use of the maxim properly prevents. *Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961) ("The maxim *noscitur a sociis,* that a word is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress.").

We are mindful that Congress likely intended the "disclose or abstain" rule to apply to some type of instrument other than a security, call, put, straddle or option. Otherwise, it would not have included "privileges with respect to" securities in § 20(d). At oral argument, however, Riverwood's lawyer persuasively addressed this concern of ours. In his view, Congress foresaw "privileges" as new types of instruments that can be traded like options and stock. *See generally* H.R.Rep. No. 355,

14

98th Cong., 1st Sess. (1983), *reprinted in* 1984 U.S.C.C.A.N. 2274 ("[T]he *markets* are changing as a result of the introduction of *new financial instruments.*") (emphasis added). Without any authoritative guidance to the contrary, we agree with him and conclude that SARs—at least SARs with features materially similar to those in this case—fall outside the range of instruments Congress contemplated in § 20(d) (and, as we have already established, §§ 10(b) and 20A(a)) of the Exchange Act.

Contrary to Clay's assertion, our holding comports with the rationale behind insider trading laws. In its most recent case on insider trading, the Supreme Court reiterated the well-established goal of these laws: to "protect the integrity of the securities markets" against insiders', tippers' and—as the Court confirmed—certain outsiders' "efforts to capitalize on nonpublic information through the purchase or sale of securities." *O'Hagan,* --- U.S. at ----, 117 S.Ct. at 2207. Treating SARs as securities (or calls, puts, straddles, options or privileges) would not serve—and could very well frustrate—this policy. In addition to the fact that no market exists to trade SARs, Congress may very well be of the opinion that such cash-only instruments are legitimate and economically-beneficial forms of compensation. *See United States v. Chestman,* 947 F.2d 551, 572 n. 1 (2d Cir.1991) (referencing academics who view insider trading to be beneficial) (*en banc* ) (Winter, J., concurring in part and dissenting in part), *cert. denied,* 503 U.S. 1004, 112 S.Ct. 1759, 118 L.Ed.2d 422 (1992). If stockholders disagree, they are not without recourse. They can replace the board of directors that endorses such an arguably-exorbitant incentive plan. State law may even permit a legal challenge to its business judgment. *See generally Smith v. Van Gorkom,* 488 A.2d 858 (Del.1985) (stockholders recovered damages in a class action against directors who made

15

uninformed decisions and acted grossly negligent).[16] In light of conspicuous congressional silence, however, we decline Clay's invitation to expand the law of insider trading to punish civilly the exercise of SARs for cash—even where, as was likely the case here, the holders actively monitor the stock's market value with knowledge of its inevitable decline so that they can cash-in at a time most profitable to themselves.[17] Accordingly, we affirm the district court's entry of summary judgment in favor of Riverwood and its officers on Clay's claim of insider trading.

## B. Securities Fraud

Section 10(b) of the Exchange Act and rule 10b-5 serve as sources for causes-of-action for not only insider trading, but also other "fraudulent practices" in connection with securities transactions. *Chiarella v. United States,* 445 U.S. 222, 226, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). Where, as here, a plaintiff alleges that a defendant-issuer failed to update a statement that became false and misleading in light of a subsequent change in circumstances, plaintiff must prove that: (1) defendant used an instrumentality of interstate commerce in connection with the securities transaction; (2) defendant omitted to state facts that would be necessary to make other statements the defendant made not misleading to plaintiff, and the omission involved material facts; (3) defendant acted knowingly; (4) plaintiff justifiably relied upon defendant's conduct; and (5) plaintiff suffered damages as a result of defendant's wrongful conduct. *See Robbins v. Koger*

---

[16]We note that Clay did not allege that in exercising the SARs, Riverwood officers breached the agreement that accompanied their grant.

[17]If the SEC were to promulgate a regulation that purports to include SARs within the range of instruments subject to the insider trading laws implicated in this case, we express no view on whether it would be a reasonable interpretation of Congress's intent. See *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843-45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see also O'Hagan,* --- U.S. at ---- - ----, 117 S.Ct. at 2217-18 (upholding 17 C.F.R. § 240.14e-3(a) under *Chevron* as a reasonable interpretation of 15 U.S.C. § 78n(e)).

*Properties, Inc.,* 116 F.3d 1441, 1447 (11th Cir.1997); Committee on Pattern Jury Instructions, District Judge's Ass'n of the Eleventh Circuit, *Pattern Jury Instructions (Civil Cases),* Federal Claims Instructions 3.1 (1990).

The second element—presently at issue—is based on the notion that "[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." *Chiarella,* 445 U.S. at 235, 100 S.Ct. 1108. In other words, "[s]ilence, absent a duty to speak, is not misleading under Rule 10b-5." *Basic Inc. v. Levinson,* 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). In this circuit, "[a] duty to disclose may ... be created by a defendant's previous decision to speak voluntarily. Where a defendant's failure to speak would render the defendant's *own* prior speech misleading or deceptive, a duty to disclose arises." *Rudolph v. Arthur Andersen & Co.,* 800 F.2d 1040, 1043 (11th Cir.1986) (reversing district court's dismissal of complaint for failure to state a claim under rule 10b-5), *cert. denied,* 480 U.S. 946, 107 S.Ct. 1604, 94 L.Ed.2d 790 (1987).

In this case, Riverwood spoke voluntarily on July 20, 1995, when it issued a press release about beginning to review "strategic alternatives" that included a "possible sale or merger" and retaining financial advisers to "contact[ ] a selective set of potential buyers[.]" Clay concedes that this statement was completely truthful when Riverwood made it. Clay argues, however, that the press release became materially false and misleading on or about September 21, 1995, in light of the fact that the previous set of potential "buyers" had narrowed to one, CD&R, after Georgia Pacific presented an unacceptable cash offer of $20 per share. Consequently, Clay posits, Riverwood and its officers' silence on that date breached their collective duty to update the statement.

We do not agree with Clay. We hold that Riverwood and its officers' silence on September 21, 1995, did not violate § 10(b) and rule 10b-5 because no reasonable jury could find that it was

17

"necessary" for Riverwood to disclose facts to prevent its July 1995 press release from misleading Clay. In *ZVI Trading Corp. Employees' Money Purchase Pension Plan & Trust v. Ross (In re Time Warner Inc. Sec. Litigation*), 9 F.3d 259 (2d Cir.1993), the Second Circuit held that "when a corporation is pursuing a *specific business goal* and announces that goal as well as an *intended approach* for reaching it, it may come under an obligation to disclose other approaches to reaching the goal when those other approaches are under active and serious consideration." 9 F.3d 259, 268 (2d Cir.1993) (emphasis added), *cert. denied,* 511 U.S. 1017, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994).[18] Riverwood, in contrast to Time Warner, expressed no "specific business goal" or "intended approach" in its July 1995 press release. To be sure, the press release was extremely non-committal. The only course of action that Riverwood committed to was "a *review* of strategic *alternatives* " that included "the *possible* sale or merger of Riverwood." (Emphasis added.) In fact, with the abundance of watered-down intentions, it was almost as if Riverwood never spoke at all.

Moreover, Riverwood did not take any action inconsistent with any of these vague pronouncements. The only thing that Riverwood actually said it would do was to "review" alternatives. No genuine factual dispute exists that Riverwood was, in fact, still "reviewing" alternatives on September 21, 1995. That CD&R's proposed leveraged buyout emerged as the best single "alternative" is inconsequential. No reasonable investor could have believed that management would not eventually narrow the initial "selective set of potential buyers" down to one, actively-pursued prospect. *See San Leandro Emergency Medical Group Profit Sharing Plan v.*

---

[18]Although it reversed the district court's dismissal of the plaintiff's complaint for failure to state a securities fraud claim under § 10(b) and rule 10b-5, the *Time Warner* court ensured that its holding was a narrow one. *See* 9 F.3d at 268 ("We do not hold that whenever a corporation speaks, it must disclose every piece of information in its possession that could affect the price of its stock."). For a discussion of the facts of *Time Warner,* see *Clay,* 964 F.Supp. at 1574.

*Philip Morris Cos.,* 75 F.3d 801, 810 (2d Cir.1996) (concluding that issuer-tobacco company's "single vague statement" that its main focus in the upcoming year would be on profits and not on market share could not "have led any reasonable investor to conclude that [the tobacco company] had committed itself to a particular marketing strategy and had foreclosed all alternatives," including the plan of action that it ultimately adopted, raising the prices of its discount cigarettes to entice more smokers to buy its premium cigarettes). The press release's reference to J.P. Morgan and Goldman Sachs corroborates this conclusion; management would not seek the assistance of financial advisers unless it wanted advice on the best "alternative."[19]

If any duty to update arose, it occurred when an "alternative" became an actual "decision." Riverwood discharged such duty on October 26, 1995, when it announced CD&R's leveraged buyout after the Board of Directors had approved it. Accordingly, we affirm the district court's entry of summary judgment in favor of Riverwood and its officers on Clay's claim of securities fraud.

## IV. CONCLUSION

For the foregoing reasons, we hold that: (1) the SARs in this case were not securities, puts, calls, straddles, options or privileges with respect to securities so as to trigger the "disclose or abstain" rule of insider trading; and (2) Riverwood's July 1995 press release did not require a subsequent disclosure of facts in order for the company or its officers to comply with the securities fraud provisions of § 10(b) of the Exchange Act and rule 10b-5. Accordingly, we affirm the judgment of the district court.[20]

---

[19]Furthermore, Clay concedes that a "leveraged buyout" is a type of "sale or merger."

[20]Clay raises three other issues on appeal: (1) whether the district court abused its discretion in denying Clay's motion for additional discovery to oppose Riverwood and its officers' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(f); (2) whether the

AFFIRMED.

CARNES, Circuit Judge, concurring specially:

I concur in the court's judgment and join the portion of the majority opinion rejecting Clay's claim that circumstances following Riverwood's July 1995 press release required subsequent disclosure under § 10(b) and Rule 10b-5. I write separately because the insider trading claim can and should be resolved on a narrower ground than that relied upon by the majority.

The majority holds that the Riverwood stock appreciation rights (SARs) are neither securities nor "puts, calls, straddles, options or privileges with respect to securities," and thus do not "trigger the "disclose or abstain' rule of insider trading." Majority op. at 213. That is a position that Riverwood itself does not even argue, agreeing instead with the district court that whether SARs are securities is "immaterial." The district court and Riverwood are right about that. We need not and should not reach the broad question of whether SARs are securities for purposes of insider trading rules. The reason we need not reach that question is that the plain language of § 20A makes it clear that Clay lacks standing to bring a claim under that provision.

In creating a private right of action for victims of insider trading under § 20A, Congress specifically limited standing to those who purchased or sold the "same class" of securities as the

district court abused its discretion in denying Clay's motion to issue subpoenas to third parties, namely Georgia Pacific, International Paper, Manville, J.P. Morgan, and Goldman Sachs; and (3) whether the district court abused its discretion in denying Clay's motion for entry of a discovery scheduling order prior to resolving the motion for summary judgment. Pursuant to Eleventh Circuit Rule 36-1, we affirm on these issues without discussion. To the extent that Clay challenges the district court's entry of summary judgment on his claims of securities fraud stemming from anonymous newspaper articles, we affirm because he abandoned the issue. *See Clay,* 964 F.Supp. at 1574-75; appellant's brief at 1 (statement of issues).

inside trader.[1] *See Fujisawa Pharm. Co. v. Kapoor,* 115 F.3d 1332, 1337 (7th Cir.1997). Riverwood does not argue that SARs cannot be considered securities, or that the exercise of SARs can never be the basis for a § 20A claim. Instead, it contends that the SARs involved in this case cannot give Clay standing to pursue a § 20A claim because Clay purchased common stock in Riverwood, which is not the same class of security as the defendants' SARs. I believe that position, more modest than the majority's holding, is correct.

Noting that Riverwood maintained a reserve of common stock shares from which to compensate the SAR holders, Clay contends that the SARs are "so fundamentally intertwined" with Riverwood common stock that they must be considered the same class of security. Clay bases this argument on the fact that the reserve of common stock guaranteed that Riverwood would be able to pay SAR holders when they exercised their rights. It did, and that was its purpose. Clay fails to explain, however, how that makes the SARs the same class of security as the stock held in reserve. The SARs specifically provided that they did not give the bearers any rights with regard to the reserve stock. The reserve of common stock was in place only to guarantee that Riverwood would have the funds when the Riverwood executives exercised their SARs. Furthermore, the SARs do not give bearers any stock voting rights, nor do they confer the opportunity to purchase shares of Riverwood common stock. Clay offers no support for the proposition that placing stock in reserve to guarantee payment on an obligation such as an SAR makes that obligation the same class of security as the stock in reserve. The logical result of Clay's position is that if cash is placed in

[1]Clay contends that § 20(d) of the 1934 Act, codified at 15 U.S.C. § 78t(d), which makes unlawful insider trading not only of a security, but of any "privilege with respect to such security" eviscerates the same class requirement. In view of the fact that § 20A was added in 1988, long after § 20(d) was enacted, and the fact that § 20A expressly requires that the inside trader and the victim trade securities of the same class, Clay's argument is not persuasive.

reserve to ensure adequate funds on hand for the exercise of SARs, then those SARs are cash, or at least are of the same class of assets as cash. His position is untenable.

Clay also attempts to draw an analogy between SARs and stock options to support his position that the Riverwood SARs are securities of the same class as Riverwood common stock. Clay relies on *Moskowitz v. Lopp,* 128 F.R.D. 624, 633-35 (E.D.Pa.1989), in which a district court held that traders of stock had standing to pursue insider trading claims against insiders who traded in stock options, on the ground that the options market and the stock market are sufficiently interrelated that the traders in the stock market are defrauded by insider trading in the stock options market. Clay contends that SARs should also be considered the same class as shares of common stock, because both SARs and stock options depend upon the underlying stock for their value.

Of course, the *Moskowitz* decision is not binding on us. Even if it were, Clay's attempted analogy ignores key distinctions between SARs and stock options. For example, options to buy give the bearer the right to purchase a given number of shares at a given price, but in order to do that the bearer has to use the market. Such options are traded through the market, and after exercising one, the investor must still sell his shares through the market in order to realize his profit. The *Moskowitz* court concluded that options could be the basis for an insider trading claim not because the option value is dependent on the stock value, but because trading in options affects the price of the underlying stock as well. *See Moskowitz,* 128 F.R.D. at 635. Insider trading in options could have a damaging effect on common stock.

In contrast, the Riverwood SARs cannot be traded through the market, and the bearer does not need to go through the market to realize his profit. In this case at least, the exercise of SARs did not affect the market in common stock as options would have, because Riverwood did not sell any

22

of the reserve stock to make the cash payments to the holders. *See Seinfeld v. Hospital Corp. of Am.,* 685 F.Supp. 1057, 1065 n. 9 (N.D.Ill.1988) (noting that exercise of SAR is exercise of right to direct cash payment). As a result, Clay's analogy to stock options is not a persuasive one.

Because Congress clearly confined § 20A standing to individuals who purchased or sold the same class of securities as the inside trader, and Clay does not fall into that category, Clay has no cause of action for insider trading under § 20A. Despite Congress' unambiguous intent, Clay argues that as a matter of policy the differences between SARs and his common stock are minor and should not prevent us from considering SARs and common stock as securities of the same class. The only case law that Clay offers in support of that contention, however, is a statement (from an opinion offered years before § 20A was enacted) that securities legislation should be construed "flexibly to effectuate its remedial purposes." *See Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 495 F.2d 228, 235 (2d Cir.1974) (citations and quotations omitted).

Even if we were free to ignore the plain language of § 20A, which we are not, interpreting that provision to effectuate its remedial purpose would not lead us to the conclusion that Clay urges on the Court. Insofar as it requires contemporaneous trading of the same class of securities, § 20A exemplifies the "fraud on the market" theory as a justification for prohibitions on insider trading. The crux of the fraud on the market theory is that a trader with inside information is able to exert an unfair advantage over other traders in the same market; even if other traders do not purchase directly from him, they are nonetheless adversely affected by the insider's trading. *See Basic Inc. v. Levinson,* 485 U.S. 224, 241-45, 108 S.Ct. 978, 988-90, 99 L.Ed.2d 194 (1988) (discussing rationale behind fraud on the market theory); *Ross v. Bank South, N.A.,* 885 F.2d 723, 739 (11th Cir.1989) (en banc) (Tjoflat, J., specially concurring) (same); *Lipton v. Documation, Inc.,* 734 F.2d

740, 745-46 (11th Cir.1984) (adopting fraud on the market theory). In the present case, however, the defendants' exercise of their SARs was wholly removed from the market. Clay has presented no evidence that the SARs affected either his decision to purchase Riverwood stock or the value of that stock when he made his purchases.

In conclusion, Clay's common stock is not of the "same class" as the Riverwood SARs within the meaning of § 20A. Thus, he cannot prevail on his § 20A claim. It is on that basis, instead of the broader one about whether SARs are securities at all, that the Court should decide this case.